**MERIT MOTORS, INC., et al., Appellants,**

v.

**CHRYSLER CORPORATION et al.**

**No. 76–1917.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 14, 1977.

Decided Dec. 20, 1977.

Jerry S. Cohen, Washington, D. C., with whom Michael D. Hausfeld, Washington, D. C., was on the brief, for appellants.

William O. Bittman, Washington, D. C., with whom William S. D'Amico and Judith L. Harris, Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, and WRIGHT and ROBB, Circuit Judges.

Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge:

In this antitrust action appellants, two Chrysler dealers, appeal from a District Court order granting summary judgment to appellees, Chrysler Corporation and several of its subsidiaries.[1] The complaint filed in

---

1. This suit was originally brought as a class action against Chrysler Corporation, Chrysler Motor Corporation, Chrysler Leasing Corpora- tion, and Chrysler Financial Corporation. *See* Antitrust Complaint for Treble Damages and Injunctive Relief, JA 28A. The District Court

the District Court alleges that various programs instituted by Chrysler in the early 1960's to increase Chrysler's sales of automobiles to "fleet purchasers" (customers who purchase more than ten vehicles within a 12-month period) violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970), and Section 2(a), (d), and (e) of the Robinson-Patman Act, 15 U.S.C. § 13(a), (d), (e) (1970). Appellants seek treble damages and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1970). The District Court granted summary judgment for appellees on each count of the complaint and then concluded its opinion by finding that appellants had not shown sufficient injury to sustain a private action under the Clayton Act. *Merit Motors, Inc. v. Chrysler Corp.*, 417 F.Supp. 263 (D.D.C. 1976). Since we agree that summary judgment was proper on the ground of lack of injury[2] as to all claims alleged in the complaint, we find it unnecessary to reach the other issues covered in the District Court's opinion or raised on this appeal.

## I. THE STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(b) of the Federal Rules of Civil Procedure, a defending party "may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part" of a claim against him. Rule 56(c) provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden of proving that there is no genuine issue as to any material fact is on the moving party, but once the moving party has submitted a properly supported motion for summary judgment, Rule 56(e) requires the opposing party to produce at least some credible evidence beyond the pleadings in response.[3]

Although the Supreme Court has cautioned against granting summary judgments too quickly in complex antitrust litigation,[4] the Court has also explicitly refused to "read [Rule 56(e)] out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support these allegations * * *." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–290,

denied certification to the class on August 15, 1975, leaving only the two named Chrysler dealers, Merit Motors, Inc. and Loren Kirkpatrick, d/b/a Kirkpatrick Motor Co., as plaintiffs. During the pendency of this suit Chrysler Motor Corporation has ceased to exist, and its functions have been by and large assumed by Chrysler Corporation. *See* brief for appellees at ii.

2. The District Court and the parties have concentrated on the requirement for proof of injury under § 4 of the Clayton Act. *See Merit Motors, Inc. v. Chrysler Corp.*, 417 F.Supp. 263, 271–272 (D.D.C. 1976); brief for appellants at 38–39; brief for appellees at 55–60. Since the complaint prayed for injunctive relief under § 16 as well as treble damages under § 4, *see* JA 28A, 37A, we find it necessary to consider the issue of injury under § 16 as well as under § 4. Although the standard for proof of injury is less demanding under § 16 than under § 4, the record in this case is such that the same result is required under either standard. *See* note 14 *infra*.

3. The full text of Rule 56(e) reads:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. *When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.* (Emphasis added.)

4. *See Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). In *First National Bank* the Court affirmed a summary judgment for the defendants in an antitrust suit on the ground that a jury could not reasonably infer a conspiracy from the facts on which the plaintiff relied in light of the overwhelming evidence to the contrary introduced by the defendants. In justifying its decision the Court explained:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. at 290, 88 S.Ct. at 1593.[5]

In considering whether to grant summary judgment in this case the District Court relied not only on *First National Bank*, but also on the length of time (nearly six years) and the "ample opportunities" for discovery that appellants had "to unearth evidence to support their allegations."[6] We also find these factors relevant to our determination of the propriety of affirming summary judgment in this case.

## II. THE SALES PROGRAMS ON WHICH THIS CASE IS BASED

During the entire period relevant to this suit the fleet market for automobiles, like the automobile market as a whole, has been dominated by General Motors and Ford.[7] Around 1962 Chrysler took steps to increase its sales by improving its image and its product and by introducing special programs designed to attract more business from fleet purchasers. These special fleet programs are the primary target of appellants' complaint. There is no dispute as to the general outline of the practices appellants attack; they may be briefly summarized as follows:[8]

### A. Subsidies to Fleet Purchasers

After the fleet purchasers buy their cars from Chrysler dealers, Chrysler grants subsidies (also called allowances or rebates) directly to the fleet purchasers. These subsidies have taken various forms, from a set rebate that is sent when the car is purchased (front end allowance) to a guarantee that the difference between the cost of a new Chrysler and its resale value will not be more than the comparable difference for Ford or General Motors cars (rear end allowance). Chrysler submitted uncontradicted evidence to the effect that these subsidy programs were established because the wholesale prices of new Chryslers were higher than the wholesale prices of comparable Ford and GM cars and the trade-in values of used Chryslers were lower than the trade-in values of Ford and GM cars.[9]

### B. Direct Leasing of Cars to Fleets

Chrysler has established a subsidiary corporation, Chrysler Leasing Corporation,

5. *See also Proctor v. State Farm Mutual Automobile Ins. Co.*, 183 U.S.App.D.C. 264, 277–278, 561 F.2d 262, 275–276 (1977); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 109–110 (2d Cir. 1975); *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 54–55 (9th Cir. 1975).

6. This case was filed nearly six years ago, and since that time a voluminous record has been compiled. Thirty-three depositions have been taken, twenty-three of which were taken by the plaintiffs, covering thousands of pages of transcript. Scores of documents have been made available for inspection by defendants, and numerous exhibits and affidavits have been filed. * * * Under these circumstances, we do not see how a trial could afford plaintiffs any greater opportunity to obtain factual support for their allegations. * * *

417 F.Supp. at 267.

7. *See United States v. General Motors Corp.*, 369 F.Supp. 1306 (E.D.Mich. 1974).

8. For fuller descriptions of these programs, *see* JA 117A–147A (memoranda describing programs), 1109A–1165A (Chrysler literature describing programs), Deposition of J. B. Sparkes, June 5, 1974, at 49–55.

9. *See* Deposition of William C. Hanway, Jr., July 11, 1974, at 15–18; Deposition of John Riccardo, March 12, 1975, at 10–13. The differential between the trade-in values for Chrysler cars and those for other comparable cars has decreased during the years the programs

which buys cars from Chrysler at the same prices charged to the dealers and then leases these cars to major fleets—most notably Avis and Hertz—for terms of four to eight months. When the leases end, the cars are reconditioned and auctioned (first to Chrysler dealers) in a way that disperses them around the country for resale.[10]

### C. Special "Benefits" Given to Large Fleet Purchasers

Chrysler has assigned special account executives to the largest fleet purchasers and has installed special equipment and procedures to facilitate their ordering of Chrysler cars. Chrysler has also entered into special promotional and advertising agreements with Avis in connection with Avis' leasing of Chrysler cars.

### D. Characteristics of Chrysler Distribution System

Appellants allege that several aspects of Chrysler's dealings with its dealers put illegal pressures on the dealers to sell at lower prices to fleets. These aspects include:

1. *Minimum Sales Responsibility (MSR).* Chrysler dealers have an obligation in their franchise to make a certain minimum number of sales per year. A dealer may count sales to fleet purchasers toward meeting his MSR.

2. *Regional Representatives.* Chrysler maintains representatives "in the field" who, among their other duties, encourage the dealers to make sales to fleet purchasers.

3. *Factory Dealerships.* Chrysler itself owns or controls some dealerships and thus has influence over the prices charged to fleets by these dealerships.

At least in part as a result of these programs,[11] Chrysler was able to increase its share of the total fleet market from 10.8% in 1962—compared to 41.1% for Chevrolet, 27.2% for Ford, and 20.9% for others (including other General Motors and Ford products but no other Chrysler products)— to 21.2% in 1974—compared to 25.1% for Chevrolet, 23.9% for Ford, and 29.8% for others.[12] Chrysler's share of the domestic retail (non-fleet) automobile market also increased during these years, from 9.8% in 1962 to between 16 and 18% in the years 1965–1972.[13]

## III. THE INJURY ISSUE

■ In order to make out a private cause of action under the Clayton Act, a plaintiff must prove that he has been or will be injured by some violation of the antitrust laws.[14] Applying the standard defined in

---

have been in operation. *See* Deposition of William C. Hanway, Jr., *supra*, at 18; *United States v. General Motors Corp., supra* note 7, 369 F.Supp. at 1307.

**10.** Deposition of William C. Hanway, Jr., *supra* note 9, at 30–34.

**11.** Chrysler also improved its image and its product during these years. *See* Deposition of John Riccardo, *supra* note 9, at 9–11. However, since the fleet market is extremely price-sensitive, *id.* at 10, the programs affecting price probably accounted for a substantial amount of Chrysler's gains in sales to fleets.

**12.** Passenger Car Leasing Market Segment Comparison, reproduced as Exhibit J to Defendants' Opposition to the Plaintiffs' Motion for Summary Judgment and Defendants' Cross Motion for Summary Judgment (hereinafter Defendants Cross Motion for Summary Judgment), JA 906A.

**13.** Data from Financial and General Fact Book, Investor Relations Office, Chrysler Corpora-

tion, June 1973, reproduced in Defendants' Cross Motion for Summary Judgment, *supra* note 12, JA 336A.

**14.** Section 4 of the Clayton Act provides that "[a]ny person who shall be *injured in his business or property* by reason of anything forbidden in the antitrust laws" may sue for treble damages. 15 U.S.C. § 15 (1970) (emphasis added). Section 16 of the Clayton Act provides for a private right of action seeking an injunction "against *threatened loss or damage* by a violation of the antitrust laws." 15 U.S.C. § 26 (1970) (emphasis added). The showing of injury required for a suit seeking an injunction is less than that required to sue for treble damages since only *threatened* rather than *actual* damages must be proved. In this case, however, where the programs in question have been in existence long enough for their potential effects on dealers to manifest themselves, the difference in the two standards is not so consequential.

*First National Bank* to the record in this case, we agree with the District Court that appellants' response to appellees' well-supported motion for summary judgment fails to raise any genuine issue of material fact on the question of injury.

Appellants' allegations that they are harmed by Chrysler's practices rest on two theories. First appellants allege that Chrysler uses certain aspects of its distribution system—the minimum sales responsibility, the regional agents, and the factory dealerships—to pressure dealers to sell to fleet purchasers at prices lower than the dealers could otherwise negotiate. In six years of discovery, however, appellants failed to produce credible evidence of any kind from any dealer (including appellants themselves) [15] supporting the inference that Chrysler has used these programs to coerce dealers to charge lower prices to fleet purchasers. In support of its motion for summary judgment Chrysler submitted uncontradicted affidavits and depositions indicating that its dealers retain complete discretion in pricing.[16] More importantly, the record contains unanswered evidence that the real "pressure" on the dealers to charge lower prices to fleet purchasers results, not from Chrysler's programs, but from the sophistication and buying power of the fleet purchasers and the competition of General Motors and Ford.[17]

Recognizing the lack of support in the record for their first theory of injury, appellants rely almost exclusively [18] on their second theory: the "inherent" economic effects of the subsidies and other special programs as set forth in the report of appellants' expert, Professor Richard Staelin.[19] Staelin's report asserts that, according to "standard economic theory," these programs inevitably harm the Chrysler dealers in three ways. First, Staelin asserts that the lower prices to the fleet purchasers mean that more new cars will be sold to the fleets, and many of these cars end up soon on the used car market. The presence of more late model used Chryslers on the market allegedly depresses the retail prices for both new and used Chryslers. Second, Staelin claims that if Chrysler could not give the subsidies it would have to lower its wholesale prices to its dealers to maximize its profits. In Staelin's view the subsidy programs thus have the effect of "squeezing" dealers between higher wholesale prices and lower retail prices. Third, Staelin notes that many fleet purchasers are long-term leasing companies and claims that these companies are in direct competition with Chrysler dealers selling new cars.

15. The District Court pointed out that both appellants indicated in their depositions that they had complete discretion in setting their prices when dealing with fleet purchasers. 417 F.Supp. at 267 & nn.2–3.

16. *See id.* at 267–268.

17. *See* Deposition of Robert W. Adams, Jr., Assistant Department Manager, Buying Services, Peterson, Howell & Heather, Inc., March 26, 1975, at 55; Deposition of James F. Carney, Vice President, Purchasing, Gelco Leasing, May 14, 1975, at 32; Deposition of William C. Hanway, Jr., *supra* note 9, at 86; Affidavit of James Kay, Jr., October 23, 1975, ¶ 4, JA 768A–769A; Affidavit of Richard C. Green, October 22, 1975, ¶ 4, JA 778A.

18. Appellants also call attention to various passages in their own depositions and those of several Chrysler executives cited in their Amended Statement of Disputed Genuine Issues, JA 1250A–1251A, to support the proposition that they (or Chrysler dealers in general) are harmed by the programs in question. Brief for appellants at 39. Rather than supporting this proposition, the depositions of the Chrysler executives discuss the steps Chrysler has taken to avoid the possible impact on prices that would occur if reconditioned used cars were "dumped" in a single market. *See, e. g.*, Deposition of William C. Hanway, Jr., *supra* note 9, at 30–34; Deposition of J. B. Sparkes, *supra* note 8, at 57–58. The passages in appellants' own depositions often repeat the allegations in the complaint and are remarkable for their lack of specificity. *See, e. g.*, Deposition of Raphael Cohen, November 9, 1970, at 102–111; Deposition of Loren Kirkpatrick, August 5, 1970, at 101–107, 141–145, 148–150. When asked in interrogatories to give more specific support for their claims of injury, appellants were evasive and cited to the abstract report of their expert, Richard Staelin. *See* Defendants' Cross Motion for Summary Judgment, *supra* note 12, JA 269A–270A & n.*.

19. Report of Professor Richard Staelin, JA 66A.

He then asserts that the dealers are injured in their competition against these leasing companies because the dealers do not receive the subsidies and other benefits granted to the leasing companies.

In its motion for summary judgment Chrysler attacked Staelin's theories on several fronts. Using its lengthy deposition of Staelin, Chrysler argued forcefully in the District Court that his theories were abstract speculation and that by his own admission he was unfamiliar with the record in this case.[20] Furthermore, Chrysler asserted that the evidence in the record contradicted rather than supported all of Staelin's predictions of "inevitable effects." Appellants' depositions of Chrysler executives revealed that an essential aspect of the fleet programs was to disperse the used cars returned to the market by the fleets so that they would have no significant impact on prices in any particular area.[21] The president of Chrysler stated that, given Chrysler's costs of production, eliminating the subsidy programs would result in increased, rather than decreased, wholesale prices to dealers.[22] Staelin himself admitted that, for all he knew, eliminating the subsidy programs might force Chrysler to "close its doors."[23] In response to Staelin's claim that Chrysler dealers are injured because discriminatory discounts and benefits are available to fleet purchasers in the long-term leasing business, Chrysler produced uncontradicted evidence that the same subsidies are available to any Chrysler dealer who chooses to enter the leasing business and that Chrysler offers special promotional advantages to encourage its dealers to enter the leasing market.[24] Finally, Chrysler pointed out that near the end of his deposition Professor Staelin had conceded that he believed Chrysler dealers "are better off now profit-wise than they were in '61 or '62, * * * that they are earning more on the average as a return on investment."[25]

After considering Chrysler's motion for summary judgment and appellants' response, the District Court dismissed Staelin's theory "since his opinion is based solely on speculations and hypotheses and is unsubstantiated by any evidence in the record * * *." 417 F.Supp. at 272. Consequently, the court held that appellants had "failed to submit any credible evidence that they suffered individual injury as a proximate result of the introduction of the fleet allowance programs." *Id.*

On appeal appellants attempt to salvage their expert's opinion by relying on cases applying Rule 703 of the Federal

---

**20.** *See* 417 F.Supp. at 272 & n.16; Defendants' Cross Motion for Summary Judgment, *supra* note 12, JA 234A–244A.

**21.** *See, e. g.*, Deposition of William C. Hanway, Jr., *supra* note 9, at 30–34 (discussing dispersal of cars returned to Chrysler Leasing Corp.).

**22.** Deposition of John Riccardo, *supra* note 9, at 22–24.

**23.** Deposition of Professor Richard Staelin, October 28, 1975, JA 613A; November 10, 1975, JA 720A.

**24.** *See* Defendants' Cross Motion for Summary Judgment, *supra* note 12, JA 262A–268A; "Guaranteed Value Plan Official Rules—1963," reproduced at JA 1120A–1121A; "Guaranteed Value Plan Official Rules—1966," reproduced at JA 1134A; "Guaranteed Value Plan Official Rules—1971," reproduced at JA 1146A. Both of the appellants have participated in these programs to some degree. *See* JA 862A–871A (Kirkpatrick); JA 873A (Merit).

**25.** Deposition of Professor Richard Staelin, November 10, 1975, JA 717A. Professor Staelin qualified this statement, noting that he "would not want to say that that is because of the subsidy program." *Id.* He would rather attribute it to programs such as a special warranty and product improvement. Yet his attempt to attribute all the dealers' success to these other programs and to claim that the subsidy programs not only failed to encourage this success but actually hampered it is totally without support. In his report and his deposition Staelin systematically ignored the uncontradicted evidence of the beneficial effects of the fleet programs on Chrysler dealers, including the profits made by dealers selling more cars to fleet purchasers and the profits made on used car sales. *See, e. g.*, Affidavit of James Kay, Jr., *supra* note 17, ¶ 4, JA 769A; Affidavit of Richard J. Green, *supra* note 17, ¶ 4, JA 778A; Deposition of Loren Kirkpatrick, *supra* note 18, at 104–109.

Rules of Evidence, adopted in 1975.[26] This rule was intended to broaden the acceptable bases of expert opinion, but it was not intended, as appellants seem to argue,[27] to make summary judgment impossible whenever a party has produced an expert to support its position. Even Rule 703 requires that the grounds relied on by an expert must be "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." While appellants claim that Staelin has merely applied "standard economic theory" to "a factual basis which is uncontroverted,"[28] it is obvious that Staelin makes unsupported assumptions about the elasticities of demand in various markets[29] and that he virtually ignores the impact of the dominant forces in the automobile market: General Motors and Ford.[30] To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than Staelin's theoretical speculations would seriously undermine the policies of Rule 56. We are unwilling to impose the fruitless expenses of litigation that would result from such a limitation on the power of a court to grant summary judgment. *Cf. Logsdon v. Baker*, 170 U.S.App.D.C. 360, 517 F.2d 174 (1975) (*per curiam*).

The cases cited by appellants accepted "reliable statistical model[s]"[31] prepared by experts "through the intelligent application of statistical and computer techniques"[32] as mechanisms to estimate the impact of illegal actions on individual plaintiffs. While appellants in this case claim that their expert has "constructed a reliable statistical marketing model to explain and demonstrate the impact of Appellees' subsidy program on the market in which Appellants and other Chrysler dealers operate," reply brief for appellants at 7, this model has never been produced,[33] and we are not willing to send this case to trial on the mere promise that a more substantial showing will be made there. Appellants had nearly six years for discovery and for development and presentation of their expert's theories before the hearing on the summary judgment motion. The District Court allowed wide discovery, including depositions of several top executives of Chrysler Corporation and production of confidential information on profitability and market strategy. Under these circumstances, we agree with the District Court and with the Supreme Court in *First National Bank* that appellants should not be permitted "to get to a jury on the basis of the allegations in their complaint[ ], coupled with the hope that something can be developed at trial in the way of evidence to support those allegations

---

**26.** Rule 703, Fed.R.Evid.:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**27.** The trial court chose to give neither weight nor credibility to the analysis of Appellants' expert. However, that should not be a factor in a summary judgment motion. * * *

Reply brief for appellants at 6. The position that an expert's opinion that lacks *any* credible support creates an issue of "fact" is clearly untenable.

**28.** Brief for appellants at 38.

**29.** *See, e. g.*, Deposition of Professor Richard Staelin, October 28, 1975, JA 454A, 517A–523A, 532A, 538A–541A, 618A–621A.

**30.** *See, e. g.*, Deposition of Professor Richard Staelin, October 28, 1975, JA 486A–488A; November 11, 1975, JA 732A–733A.

**31.** *In re Sugar Industry Antitrust Litigation*, 1976–2 Trade Cas. ¶ 61,214 at 70,561 (E.D.Pa. 1976).

**32.** *In re Antibiotic Antitrust Actions*, 333 F.Supp. 278, 289 (S.D.N.Y. 1971).

**33.** The 13-page report in the record certainly does not meet this description. Since appellants originally moved for summary judgment in their favor on the basis of this report, it is strange that they have continually met criticism of the report by claiming that it is still "not completed." *See, e. g.*, Deposition of Professor Richard Staelin, October 28, 1975, JA 699A; November 10, 1975, JA 764A–766A.

* * *." 391 U.S. at 289–290, 88 S.Ct. at 1593.

Accordingly, the order of the District Court granting summary judgment for appellees is

*Affirmed.*