**FIRST UNITED FINANCIAL CORPORATION, Plaintiff–Appellant,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant–Appellee.**

No. 95–60554.

United States Court of Appeals, Fifth Circuit.

Sept. 27, 1996.

Kent Edmund Hanson, Denver, CO, Maurice M. Dantin, Columbia, MS, for First United Financial Corp., plaintiff-appellant.

Ronald Alton Yarbrough, Ott & Purdy, Jackson, MS, for United States Fidelity & Guaranty Co., defendant-appellee.

Before REAVLEY, KING and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

The judgment of the district court is affirmed for the following reasons:

1. No issue of coverage is raised by First United in the summary judgment record. It contends that Paul Broadhead and expert witnesses, by their depositions, testify that employees of First United Bank dishonestly caused it to buy loan participations that led to losses. We agree with the district court that this testimony fails to prove dishonesty. Broadhead only concludes, "on reflection," that O'Dom and his officers were part of a dishonest plot when O'Dom said these were good loans. He refers to a banking relationship by which First United Bank took many loans, most of which were profitable to the Bank, and all of which were taken with the right to return to the selling bank until reimbursement was stopped by the FDIC in 1984, long after the assailed transactions in which O'Dom participated.

The expert testimony was, likewise, properly rejected by the court. Their opinion of dishonesty goes beyond the scope of expertise. They looked at boxes of documents and the relationships between O'Dom and the notorious Herman Beebe and concluded that O'Dom was dishonest. Their conclusion will not substitute for evidence of dishonesty. By their knowledge of banking practices they may only assist and not replace the fact finder.

2. U.S.F. & G. cannot be faulted for its response to the claim against First United Bank by attorney Turley in 1986 and 1987. The proof of loss filed by the Bank on June 29, 1987 must be taken in context with the discussions between the parties. The Bank claimed no losses caused by its employees but only called for protection against liability claimed against it on behalf of the lawyer for its stockholders. When that claim was abandoned, the surety properly ceased its activity.

3. We would reach the same result if this appeal were from a judgment as a matter of law after trial but upon this same evidence. The admissibility of expert testi-

mony is governed by the same rules, whether at trial or on summary judgment. And we review the decision of the trial court by the same abuse of discretion standard. *Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1109, *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992). For this reason, the concurring opinion is both unnecessary and unhelpful. The writer of that opinion tries to justify his product by saying that admissibility of the expert opinion is not the issue here. The district court ruled that there was *no evidence* of dishonesty. Counsel for appellee has taken that position in the district court and in this court. Judges need not initiate nice questions for legal exercise.

AFFIRMED.

EMILIO M. GARZA, Circuit Judge, specially concurring:

I concur in the judgment of the court. I write separately, however, to address an issue raised by the parties which this circuit has yet to decide: the tension between FED. R.CIV.P. 56(e)'s requirement that summary judgment evidence "set forth specific facts showing that there is a genuine issue for trial" and FED.R.EVID. 703's provision that "the facts or data [underlying expert opinions] need not be admissible in evidence." This issue is squarely presented by the parties through their use of experts on the issue of dishonesty.

I

First United is a bank holding company, headquartered in eastern Mississippi, with several branches in communities throughout eastern and central Mississippi. First United purchased insurance coverage from USF & G in the form of a "bankers blanket bond," also commonly referred to as a "fidelity bond." The bond provided coverage for losses resulting from the dishonest or fraudulent acts of First United's employees. The bond included both first-party coverage, for losses directly sustained by First United, and third-party coverage, for losses sustained as the result of suits by third parties. During the bond's coverage period, First United received two letters from an attorney threatening a derivative suit on behalf of First United's shareholders. These letters alleged that former directors and officers of First United had negligently and fraudulently caused First United to make millions of dollars in "bad loans." Pursuant to the terms of the bond for third-party coverage, First United notified USF & G of the letters and the possibility of suit. After numerous extensions, First United also filed a "proof of loss" form with USF & G, which disclosed First United's knowledge of the allegations made against its former directors and officers. The "proof of loss" form does not specify whether it was filed pursuant to the third-party coverage or the first-party coverage provisions of the bond. The threatened lawsuit was never filed, and First United eventually notified USF & G that the claims had been abandoned.

Three years later, First United's attorneys sent USF & G a "settlement demand" letter, alleging that the "proof of loss" form filed with USF & G constituted a claim for payment under the first-party coverage provisions of the bond, and that USF & G had breached *its duty of good faith* to First United by failing to fully investigate that claim. The letter set forth the following facts: Richard O'Dom once owned 100% of the stock of First United. Harry Sivley was the Chief Executive Officer of First United Bank, one of the branch banks in the First United system. O'Dom was also a boardmember of Bossier Bank and Trust Company ("Bossier Bank"), located in Bossier City, Louisiana. During the time that O'Dom controlled First United, First United purchased over ninety "loan participations," which are portions of existing loans, from Bossier Bank. Many of these loan participations were still active when O'Dom sold First United to Paul Broadhead, a boardmember of First United Bank. Sivley continued to serve as CEO of First United Bank after the sale of First United to Broadhead. First United and its branch banks sustained significant losses on twelve of the loan participations purchased from Bossier Bank.

First United filed suit against USF & G in district court, seeking recovery in contract and in tort. In its breach of contract claim, First United alleged that the losses on the

138

twelve above-mentioned loan participations were covered under the bond because they were caused by the dishonest conduct of O'Dom and Sivley. In its bad faith tort claim, First United alleged that USF & G violated its duties of good faith and fair dealing in handling First United's coverage claim under the bond. First United and USF & G filed cross-motions for summary judgment on both claims. The district court granted USF & G's motion for summary judgment on the coverage issue, holding that First United had not presented any evidence of fraudulent or dishonest conduct. The district court then denied the summary judgment motions pertaining to the bad faith tort claim as moot, and entered judgment for USF & G.

## II

First United argues that the district court erred by granting USF & G's motion for summary judgment on the coverage issue. We review a grant of summary judgment de novo, applying the same standards as the district court. *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 199 (5th Cir.1993). Summary judgment is appropriate in cases in which there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P.

---

1. First United argues that the district court erred by adopting the definition of "dishonest or fraudulent acts" provided in the bankers blanket bond. The result under the Rule 56(e)/Rule 703 analysis, however, would be the same under any of the definitions of dishonesty proffered by either party. Therefore, this analysis need only adhere to the following standard: "[A]s the cases universally recognize, in order for there to be liability on the [fidelity] bond, there must be something more than negligence, mistake, carelessness, or incompetence." *Eglin Nat'l Bank v. Home Indem. Co.*, 583 F.2d 1281, 1285 (5th Cir.1978).

2. Implicit in the majority opinion is the assertion that we are faced with a simple issue of dishonesty for which expert testimony is inherently inappropriate. *See* maj. op. at 5665 ("[The experts'] opinion of dishonesty goes beyond the scope of expertise.... Their conclusion will not substitute for evidence of dishonesty."). On the contrary, First United's claims of dishonesty are founded on several intricate and complex banking transactions for which specialized knowledge is crucial to uncover dishonest or fraudulent acts.

---

56(c). In order to establish coverage under a fidelity bond, an insured must prove (1) that its employees engaged in fraudulent or dishonest acts,[1] and (2) that such acts caused the loss of which the insured complains. *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 974 (5th Cir.1995).

As evidence that O'Dom and Sivley acted dishonestly in connection with the purchase of the challenged loan participations, First United relies primarily on the deposition testimony of two financial experts, Charles Cooper and Arthur Leiser. After reviewing the bank files and records pertaining to the challenged loan participations, Cooper and Leiser both concluded that O'Dom and Sivley acted dishonestly at the time that the loan participations were purchased. In determining whether the depositions of Cooper and Leiser create an issue of material fact as to the dishonesty of O'Dom and Sivley, we are faced with an issue requiring consideration of the interplay between an evidentiary rule pertaining to expert witnesses and the procedural rule pertaining to summary judgment.[2]

I note at the outset that a district court may inquire into the reliability and foundation of an expert opinion in order to determine the *admissibility* of that opinion. Rule 703 of the Federal Rules of Evidence states

---

According to FED.R.EVID. 702, a qualified expert may testify, in the form of opinion or otherwise, as to any knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Dishonesty in the context of the purchase of loan participations is a fact in issue in this case. Not only is expert testimony on loan procedures, industry custom, and prudent conduct permissible, but, as explicitly recognized in the committee notes to Rule 702, "[i]t will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge from the facts. See Rules 703 to 705." FED.R.EVID. 702 advisory committee notes. Moreover, Rule 704 specifically abolishes the old "ultimate issue" rule by stating that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED.R.EVID. 704. Consequently, dishonesty in the context of the complex transactions at issue is a proper subject for expert testimony.

that an expert's opinion should be admissible so long as the sources underlying that opinion are of a type reasonably relied on by experts in the field.[3] We have analyzed and applied this Rule 703 standard on several occasions. In *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir.1987), the plaintiff sought damages for a medical condition allegedly caused by the defendant's pesticide product. *Id.* at 421. The district court ruled that the testimony of the plaintiff's only expert was inadmissible under Rule 703, and granted summary judgment for the defendant. *Id.* We affirmed, holding that the expert's opinion, which was based largely on the plaintiff's statements about what he believed to have caused his symptoms, "lacks the foundation and reliability necessary to support expert testimony." *Id.* at 424. *Viterbo* has come to stand for the proposition that, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Id.*[4] Our inquiry today is different. The district court in this case made no evidentiary ruling as to the admissibility of the depositions of Cooper and Leiser.[5] Instead, the district court held that the deposition testimony of Cooper and Leiser was not sufficient to create a fact issue as to whether the actions of O'Dom and Sivley were dishonest. Therefore, the primary focus of our analysis is not Rule 703 of the Federal Rules of Evidence, but rather Rule 56 of the Federal Rules of Civil Procedure.[6]

Rule 56(e) of the Federal Rules of Civil Procedure states that an affidavit submitted in opposition to a motion for summary judgment must set forth specific facts establishing a genuine issue of material fact.[7] Because it applies generally to all affidavits submitted in connection with a motion for summary judgment, Rule 56(e) applies to expert affidavits admitted in accordance with Rule 703 at the summary judgment stage of proceedings. This Circuit has not previously discussed the distinction, if any, between the admissibility requirements of Rule 703 and

---

3. Rule 703 provides, in relevant part:
   The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,* the facts or data need not be admissible in evidence.
   FED.R.EVID. 703 (emphasis added).

4. *See also Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 827–28 (5th Cir.1993) (affirming district court's grant of summary judgment after holding that district court did not err by excluding opinions of plaintiffs' experts under Rule 703), *cert. denied*, 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994); *Slaughter v. Southern Talc Co.*, 919 F.2d 304, 306–07 (5th Cir.1990) (same).

5. In fact, USF & G concedes that the documents reviewed by Cooper and Leiser before reaching their conclusions are the types of documents reasonably relied on by financial experts in the field. Nor does USF & G challenge the qualifications of Cooper and Leiser as expert witnesses.

6. The majority asserts that resolution of the conflict between Rules 703 and 56(e) is unnecessary because "[t]he admissibility of expert testimony is governed by the same rules, whether at trial or on summary judgment." Neither party, however, contests the use of expert testimony in this case. Therefore, admissibility of the parties' expert testimony is not at issue on appeal. The precise issue under Rule 56(e) is whether expert opinion evidence offered for the purpose of defeating a motion for summary judgment requires more than bald conclusions without discernible factual support. *Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993) (noting that a court may grant summary judgment under Rule 56 after properly admitting expert testimony under Rule 702 where "the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true"). For this reason, the *Christophersen* abuse of discretion standard for reviewing trial court decisions concerning admissibility under Rule 702 is inapplicable in the Rule 56(e) context. *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1109, *cert. denied*, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992).

7. Rule 56(e) provides, in relevant part:
   The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but *the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.*
   FED.R.CIV.P. 56(e) (emphasis added).

the specificity requirements of Rule 56(e).[8]

The relationship between Rule 703 and Rule 56 was first addressed at length by Judge J. Skelly Wright in *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C.Cir. 1977). Judge Wright observed that although Rule 703 was intended to broaden the acceptable bases of expert opinion, it was not intended "to make summary judgment impossible whenever a party has produced an expert to support its position." *Id.* at 673. The opinion's reasoning proceeds:

> To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more bases in or out of the record than [the expert]'s theoretical speculations would seriously undermine the policies of Rule 56. We are unwilling to impose the fruitless expenses of litigation that would result from such a limitation on the power of a court to grant summary judgment.

*Id.* In accordance with this sentiment, the Circuit Courts that have confronted the issue agree that the sufficiency of an expert's opinion under Rule 56 is an issue distinct from the admissibility of an expert's opinion under Rule 703 and Rule 705.[9] *See Ambrosini v. Labarraque*, 966 F.2d 1464, 1470 (D.C.Cir. 1992) (citing cases). However, the Circuits do not agree as to how much the Rule 703 and Rule 56(e) standards differ, and consequently do not agree as to exactly what Rule 56(e) requires when applied to expert affidavits.

The First and Seventh Circuits interpret the "set forth specific facts" requirement of Rule 56(e) to require experts to "set forth" in their affidavits the reasoning process underlying their opinions. In *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir.1989), the plaintiffs brought an action under the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. §§ 1972, 1975. In support of their claims, the plaintiffs presented the affidavit of a qualified expert, who concluded that the banking practices challenged by the plaintiffs were unnecessary, inappropriate, nontraditional, and contrary to good faith and fair dealing. *Mid–State Fertilizer*, 877 F.2d at 1338–39. The affidavit stated further that the expert's opinion was based on his review of various pleadings, depositions, and bank documents relevant to the case. *Id.* The district court held the affidavit insufficient to overcome the defendants' motion for summary judgment on the issue of whether the challenged banking practices were customary and reasonable. *Id.* at 1338. The Seventh Circuit affirmed, holding that the plaintiffs' expert's affidavit did not comply with the requirements of Rule 56(e). In so holding, the court explained:

> Rule 56(e) of the Rules of Civil Procedure provides that affidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. They shall "set forth facts" and by implication in the case of experts (who are not fact witnesses) a process of reasoning beginning from a firm foundation.

*Id.* at 1339. The First Circuit followed *Mid–State Fertilizer* in *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994), a wrongful death action filed against a snow plow frame manufacturer. In opposition to the defendant's motion for summary judgment, the *Hayes* plaintiffs

---

8. In affirming the district court's grant of summary judgment in *Orthopedic & Sports Injury Clinic v. Wang Lab., Inc.*, 922 F.2d 220 (5th Cir.1991), we relied on case law applying Rule 703, even though the district court had not ruled the plaintiff's expert's affidavit inadmissible. *See id.* at 225 (citing *Slaughter*, 919 F.2d at 306–07; *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123–24 (5th Cir.1988); *Viterbo*, 826 F.2d at 422, 424). Although our opinion in *Orthopedic & Sports Injury Clinic* does not explicitly discuss the specificity requirement of Rule 56(e), we did find the expert's affidavit at issue to be "wholly or almost wholly conclusory and ... not supported by sufficient facts." *Id.* at 224.

9. Rule 705 provides:

> The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying fact or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Fed.R.Evid. 705.

proffered the affidavits of several experts, each of which stated the opinion that, based on their review of the pleadings and relevant medical records, the design of the snow plow frame had caused the accident at issue. *Id.* at 92–94. The district court granted summary judgment on the causation issue under Rule 56(e), and the First Circuit affirmed, noting that an expert's affidavit "must at least include the factual basis and the process of reasoning which makes the conclusion viable." *Id.* at 92.

The Ninth Circuit and the D.C. Circuit have not interpreted Rule 56(e) as requiring that an expert affidavit include the reasoning process underlying an expert's opinion. In *Bulthuis v. Rexall Corp.,* 789 F.2d 1315 (9th Cir.1985), the plaintiff alleged that she developed cancer of the cervix as a result of her mother's treatment during pregnancy with a drug manufactured by the defendant. In support of her claim, the plaintiff in *Bulthuis* presented the affidavits of two of her doctors, who stated their opinions that, based on observed changes in plaintiff's vaginal tissue, plaintiff's cancer was caused by exposure to the defendant's product. *Id.* at 1316–17. The district court granted summary judgment for the defendant, holding that the doctors failed to set forth a reasonable basis to support their opinions. *Id.* at 1317. The Ninth Circuit reversed, offering the following interpretation of Rule 56(e): "Expert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not." *Id.* at 1318. The D.C. Circuit followed *Bulthuis* in *Ambrosini v. Labarraque,* 966 F.2d 1464 (D.C.Cir.1992), another case involving a suit against a drug manufac-turer for injuries allegedly caused by drugs administered during pregnancy. In support of their claim, the plaintiffs in *Ambrosini* submitted the affidavit of a doctor who concluded that, based on "the available scientific and epidemiological data" and his review of the relevant. medical records, defendant's product caused the plaintiffs' child's birth defects. *Id.* at 1470. The district court granted summary judgment for the defendant, and the D.C. Circuit reversed, holding that the doctor's disclosure of the records he relied on sufficed to meet the "specific facts" requirement of Rule 56(e). *Id.* at 1470–71.

Having carefully considered these and other cases, I am persuaded that the better interpretation of Rule 56(e) requires expert affidavits to include some indication of the reasoning process underlying the expert's opinion. Rule 56(e) requires that affidavits submitted in opposition to a motion for summary judgment "set forth specific facts showing that there is a genuine issue for trial." An expert's affidavit which discloses the materials on which the expert based his opinion does set forth "specific facts." However, those "specific facts" do not "show that there is a genuine issue for trial" unless the affidavit evidences some rational connection between the expert's sources and the expert's opinion. An expert's affidavit that contains "no hint of an inferential process, no discussion of hypotheses considered and rejected," *Mid–State Fertilizer,* 877 F.2d at 1339, should not provide "a free pass to trial every time that a conflict of fact is based on expert testimony." *Hayes,* 8 F.3d at 92. Accordingly, I would hold that Rule 56(e) requires expert affidavits to include, in addition to the materials on which the expert based his opinion, some indication of the reasoning process underlying the expert's opinion.[10] The rationale for such a holding is further illustrated

---

**10.** The district court's bench opinion in this case suggests that First United was required to include the records and materials reviewed by Cooper and Leiser in the summary judgment record:

Now, counsel is correct that experts can use generally accepted methods in their field of expertise to interpret evidence, but that does not give experts the right to testify about factual conclusions. The facts must be in evidence, and the expert must interpret them. That's not what has been done here. The experts have

said, "We went to the bank and we examined the records, and they show evidence of dishonesty." There's not a single one of those records in evidence or before this Court.

My interpretation of the requirements under Rule 56(e) would not require that all materials relied on by expert witnesses be included in the summary judgment record. Rather, a party opposing a motion for summary judgment with an expert affidavit need only set forth in that affidavit "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e).

by application to the facts of the present case.

First, in the deposition of expert Charles Cooper,[11] Cooper testified that he reviewed the pleadings in the case, the bank files relevant to the loan participations at issue, internal bank letters and memos, minutes from relevant meetings of bank officers and directors, and correspondence between First United's branch banks and bank regulators. Cooper then testified that, based on his review of these materials, the losses on the challenged loan participations were caused by the fraud or dishonesty of Richard O'Dom and Harry Sivley. However, when questioned as to what in the materials he reviewed led him to conclude that either O'Dom or Sivley acted fraudulently or dishonestly, Cooper responded only that the loan participations purchased at the direction of O'Dom and Sivley would not have been purchased by a "prudent banker."[12] In other words, Cooper's deposition sets forth specific facts which would support a reasoned conclusion that O'Dom and Sivley acted *negligently* in directing the bank to purchase the loan participations at issue. However, Cooper's deposition sets forth no facts which indicate that O'Dom or Sivley acted *fraudulently* or *dishonestly* in connection with these loan participations.[13] Nor does Cooper's deposition indicate any process of reasoning

11. Rule 56(e) provides that "[t]he court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Fed.R.Civ.P. 56(e). Therefore, the rule's requirement that specific facts be set forth by "affidavits or as otherwise provided in this rule," *id.*, applies equally to the expert *depositions* submitted by First United in opposition to USF & G's motion for summary judgment in this case.

12. Cooper's deposition testimony provides, in relevant part:

Q. In other words, are you saying there was not sufficient information contained in the Gordon Francis loan documentation? Is that what you're saying?
A. Yes.
Q. Not sufficient information contained in the Gordon Francis loan documentation to show what?
A. For the bank to make a determination that it was a loan of sound quality.
Q. What is lacking in your opinion, Mr. Cooper?
A. The primary thing that is lacking is an evaluation of the credit quality of the loan.
Q. What do you mean?
A. As an example: The bank did not have a financial statement on Gordon Francis, who was a borrower. And you cannot make a decision about the credit quality of the customer if you don't have a financial statement on him.... You cannot determine the soundness of the loan unless you know something about the source of repayment.
. . . .
Q. So where is the harm?
A. The harm was that they cannot make a credit decision on the customer unless they have the financial statement. If they had the financial statement that they subsequently received, it's my estimation that a prudent banker would not have made the loan. But the primary underlying fact to this is that they purchased these participations in total disregard for prudent banking practices.
Q. Is that bad business?
A. Sure.
. . . .
Q. Well, tell me why you think there was an intent to defraud in connection with the Gordon Francis loan.
A. The scheme that was employed here was to purchase participations from Bossier Bank & Trust in complete disregard for the credit quality of the bank—of the participations in order for them to perpetuate their program. And the information that I just gave you was the type of credit quality of participations that they were purchasing. A prudent banker would not buy participations in that particular loan. And not only was the information bad, it was also nonexistent at the time they made their decision.

13. Cooper did testify that his review of the loan participation files revealed that "self-dealing was considered a possibility." However, when questioned further, Cooper indicated that there was nothing improper about the "self-dealing" of which he had earlier alluded:

Q. Now, Mr. O'Dom for a period of time was also a director of Bossier Bank & Trust Company, was he not?
A. Correct.
Q. And during part of that time that he was a director at Bossier Bank, he was also the controlling shareholder of his banks in Mississippi?
A. Yes.
Q. And those banks that he controlled in Mississippi were purchasing loan participations from Bossier Bank at that time. That's correct, isn't it?
A. Yes.
Q. In your opinion, is there anything improper involved in a director of one bank approving purchases of a loan participation in

that would explain why a failure to act in conformity with the standard of care exercised by a prudent banker would constitute fraud or dishonesty in this context. Because Cooper's deposition fails to give any indication of the reasoning process underlying his opinion, I would find that Cooper's deposition fails to "set forth specific facts showing there is a genuine issue for trial," in accordance with Rule 56(e).

Second, in the deposition of expert Arthur Leiser, Leiser testified that he reviewed the reports of federal bank examiners, reports of Mississippi state bank examiners, and internal letters and memos from the files of First United's branch banks. Like Cooper, Leiser concluded that, based on his review of these materials, O'Dom and Sivley had acted fraudulently or dishonestly in connection with the purchase of the loan participations. However, when questioned about what information in the materials he reviewed caused him to reach that opinion, Leiser answered that adverse classifications of the loan participations by federal regulators showed that the loans were of poor quality.[14] Like Cooper's deposition, Leiser's deposition sets forth facts which would support a reasoned opinion that O'Dom and Sivley made poor business decisions, or that they acted contrary to the standard of care exercised by a prudent banker. However, Leiser's testimony does not set forth any process of reasoning to explain why the purchase of adversely classified loans constitutes fraudulent or dishonest conduct.[15] Therefore, I would find that Leiser's deposition also fails to satisfy Rule 56(e)'s requirement to "set forth specific

which that—from a bank in which that same director has a financial interest?

A. In the context that the question is stated, if the discloser [sic] of that interest is made to the board of the purchasing party and that information obtained is on that particular loan or loans is completely disclosed, then there would be no—nothing wrong, period. There are prohibitions against people serving on boards of—of both banks or on more than one bank. But in this particular case, the prohibition does not apply, as I understand it.

14. Leiser's deposition testimony provides, in relevant part:

Q. Mr. Leiser, in those 1976 to 1985 FDIC reports that you relied on in coming to your conclusion in the month of May that there had been fraudulent and dishonest conduct on the part of Mr. Sivley and Mr. O'Dom, was there anything in those reports other than the names of some people who you had some prior knowledge of based on your Texas examinations?

A. Yes.

Q. What else was in those reports?

A. The examiner's conclusions.

Q. What conclusions?

A. The conclusions that these loans were not loans of quality. The fact that these loans, a lot of them, were being adversely classified by the examiners. The fact that Bossier Bank's own statistics that related to their asset quality in relation to their total assets and asset quality in relation to its total capital was beginning to climb to dangerously high levels; that the delinquent and past due loan ratios were getting extremely high levels; that the liquidity of the bank was threatened because of its low level; that the management or control of the bank was not a regular type of operator. He was an out of ordinary type of regulator by his banking practices.

15. In fact, Leiser admitted that his opinion had been influenced by factors completely unrelated to his review of the relevant bank files and regulatory reports, namely his knowledge of the involvement of Bossier Bank in the failure of several savings and loans in Texas in the 1980's:

A. Well, there are—there is knowledge that I have that probably I should tell you about, and I have already alluded to it earlier. In my experience in the S and L industry, in Texas, I saw activities by people that are in this case that were bad activities in Texas that hurt the Texas S and L industry.

Q. Who are those people?

. . . .

A. Texas Life and Mr. Beebe and Mr. O'Dom. There were some big S and L's over there that were affected by the operations of these named people. That gave me a conclusion also as early on in the testimony that I talked about. I have seen these people, Mr. Yarbrough, in Texas. That's probably the reason why I'm here. Because I have knowledge of them and what they did over there. And their mode of operation, the lending of the money to somebody to buy a bank or an S and L, and when the money is loaned by Bossier Bank, they become more or less, you heard me use the term today, I think captive correspondent. That means that they were in many ways controlled by the lender because they were obligated. And they were required to buy participations if that were the case, or to make loans if that were the case.

. . . .

Q. And is it your contention then that Mr. O'Dom was directly involved or indirectly involved in the failure of these S and L's that your have mentioned?

A. I think Mr. Beebe was involved in it and Mr. O'Dom was in Mr. Beebe's organization. No, sir, I'm not saying Mr. O'Dom caused it

facts showing there is a genuine issue for trial."

Having reviewed the record as a whole, I would find that First United has failed to raise a genuine issue of fact as to whether O'Dom or Sivley acted fraudulently or dishonestly in connection with the purchase of the loan participations at issue in this case.[16] Accordingly, I would affirm the district court's grant of summary judgment in favor of USF & G. However, I would do so on the basis that Rule 56(e) affidavits—including those of experts—are required to "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e).

per se. But I'm saying that Mr. O'Dom had a connection to Mr. Beebe who was responsible for these disasters in Texas.

16. In opposition to USF & G's motion for summary judgment, First United also presented the deposition of Paul Broadhead and an exhibit, First United's answers to USF & G's supplemental interrogatories. Broadhead testified that O'Dom lied to him by telling him that the loan participation purchases were good investments. Broadhead also testified that he had no personal knowledge of any of the matters underlying First United's claims, and that he had not seen the documents that were reviewed by First United's experts. We have repeatedly stated that conclusory statements based on conjecture will not defeat a motion for summary judgment. *See Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 98 (5th Cir.1993) (citing cases). For this reason, Broadhead's deposition is insufficient to raise a genuine issue of fact as to whether O'Dom acted fraudulently or dishonestly in connection with the purchase of the challenged loan participations.

In its answers to USF & G's supplemental interrogatories, First United lists and describes the twelve loan participations that form the basis for this suit. This exhibit indicates that the purchases of these loan participations were not good business decisions, aptly detailing the deficiencies in the credit quality of the loan participations and the resulting losses sustained by First United. However, the exhibit provides no evidence that O'Dom, Sivley, or any other employee of First United acted fraudulently or dishonestly in connection with these purchases. Therefore, First United's answers to USF & G's supplemental interrogatories do not raise a genuine issue of material fact regarding fraud or dishonesty.