# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2023

Lyle W. Cayce
Clerk

————————

No. 22-10360

————————

OTIS CRANDEL, *as dependent administrator of*, and *on behalf of* BILLY WAYNE WORL, JR., EMILY GARCIA, JAMES MATTHEW GARCIA, and JARED ANDREW GARCIA, *individually*, THE ESTATE OF BRENDA KAYE WORL, and BRENDA KAYE WORL'S *heirs-at-law*; BILLY WAYNE WORL, JR., *Individually*,

*Plaintiffs—Appellants*,

*versus*

DALENA HALL; CARI RENEA MCGOWEN,

*Defendants—Appellees*,

CONSOLIDATED WITH

————————

No. 22-10361

————————

OTIS CRANDEL, *as dependent administrator of*, and *on behalf of* BILLY WAYNE WORL, JR., EMILY GARCIA, JAMES MATTHEW GARCIA, and JARED ANDREW GARCIA, *individually*, THE ESTATE OF BRENDA KAYE WORL, and BRENDA KAYE WORL'S *heirs-at-law*; BILLY WAYNE WORL, JR., *Individually*,

*Plaintiffs—Appellants*,

*versus*

Vegas Hastings; Daniel Piper,

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 1:21-CV-75, 1:21-CV-75

_____

Before Barksdale, Southwick, and Higginson, *Circuit Judges*.

Rhesa Hawkins Barksdale, *Circuit Judge*:

This opinion is rendered contemporaneously with the opinion for the appeal in 22-50102, *Edmiston v. Borrego*. The two opinions concern the suicide by two pretrial detainees in two Texas jails and, *inter alia*, failure-to-protect claims. Moreover, the same counsel for plaintiffs appear in each appeal.

For the challenge at hand to four defendants' being awarded summary judgment based on qualified immunity, primarily at issue is whether they possessed subjective knowledge of a substantial risk of suicide by detainee Brenda Kaye Worl. The two jailer-defendants and two officer-defendants filed two separate summary-judgment motions; and the resulting two contested judgments were entered pursuant to Federal Rule of Civil Procedure 54(b) ("[T]he court may direct entry of final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay".).

This action under 42 U.S.C. § 1983 arises out of Worl's death while in pretrial detention in the Callahan County, Texas, Jail. Plaintiffs' challenge to the adverse summary judgments includes contesting evidentiary rulings. Plaintiffs fail to show the requisite genuine dispute of material fact for whether the four defendants had subjective knowledge of a substantial risk of suicide; therefore, they fail to show a constitutional violation. And, even if

2

the court abused its discretion in sustaining defendants' evidentiary objections, any error was harmless. Accordingly, the two summary judgments based on qualified immunity are proper. Therefore, the two Rule 54(b) judgments are AFFIRMED.

I.

Plaintiffs assert claims against Dalena Hall, Cari Renea McGowen, Officer Vegas Hastings, and Officer Daniel Piper for failing to protect Worl, in violation of the Fourteenth Amendment. (The claims against these four defendants for bystander liability were also dismissed based on qualified immunity.)

Plaintiffs also claim under § 1983 and *Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978), that the jail-suicide-prevention policies of Callahan County and City of Clyde, Texas, caused a violation of Worl's constitutional rights. Those claims are not at issue in these two consolidated appeals.

A.

The following recitation of facts is, unless otherwise noted, based on the summary-judgment record, including, *inter alia*: party affidavits, depositions, reports, the Officers' body-cam videos, and jail-surveillance video. Along that line, to the extent minor differences exist between the affidavits and depositions, the latter controls. *E.g.*, *S.W.S. Erectors v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). Additionally, we give weight to the extensive videos from the Officers' body-cameras and the jail-surveillance cameras. These provide compelling summary-judgment evidence regarding the four defendants' interactions with Worl.

At 10:13 p.m. on 2 April 2019, Callahan County dispatch received a 911 call from Worl, charging domestic abuse by her husband. Hall, a jailer-

dispatcher with the Callahan County Jail, received the call and dispatched Clyde, Texas, Police Officers Hastings and Piper (the Officers). (As shown in the Officers' body-cam videos, two other unidentified officers were also at the Worls' home that night. These two officers are not parties in this action.)

The Officers arrived at the scene at 10:17 p.m., and Worl and her husband, Billy Worl, spoke with them. It appeared to the Officers that the incident involved conduct by both parties. Billy Worl stated, as documented in Officer Hastings' report, and as recorded in his body-cam video, that the couple had "drank a couple boxes of wine"; and the Officers noted he smelled of alcohol and Worl appeared to be intoxicated.

Due to jail-capacity concerns—there was only room for one of the Worls—the Officers arrested Worl for assault, partially due to her behavior at the scene after they arrived and because she had two prior arrests for assault. Officer Hastings transported Worl to the jail for booking; Officer Piper followed to observe.

After arriving at the jail a few minutes after 11:00 p.m., one of Worl's hands slipped out of her handcuffs as she waited to be booked. Instead of securing her hand, McGowen, also a jailer-dispatcher with the jail, removed the handcuffs. Officer Hastings then escorted Worl to the booking area, where Hall attempted to begin the booking process.

Worl was uncooperative and refused to answer questions, including those for the jail's "Screening Form for Suicide and Medical/Mental/Developmental Impairments". Officer Piper and McGowen assisted Hall and Officer Hastings.

After the four defendants attempted to persuade Worl to comply, it was decided that it would be best to allow Worl to calm-down before continuing. McGowen conducted a pat-down of Worl, confiscating her coat, shoes, and an eyeglass lens she had felt in Worl's coat pocket. McGowen

then, in the presence of Officer Hastings, asked Worl whether she had ever attempted suicide; in response, she presented her arms and said, "I don't know. Have I?".

McGowen, with Officer Hastings "observ[ing] from the adjacent hallway", then placed Worl in the jail's visitation room at 11:33 p.m. McGowen, in her affidavit, explained: because Worl was "brought in on an assault charge and because of her behavior", "it was not safe to place [her] in a cell with another inmate"; and, because the jail was then at full capacity, Worl was placed in the visitation room. In her deposition, McGowen expanded on this, explaining that Worl was placed in the visitation room so "she wouldn't be out in the open just to run around"; and that she could not be placed in a cell with another inmate because "[s]he might be combative with the other inmate".

The visitation room is a small area used to permit detainees to converse with visitors who sit outside the room in the hallway, on the other side of the two observation windows. Detainees speak with visitors through telephones mounted on the room's wall. The room includes a bench, two small tabletops, and two mounted telephones—one of the telephone's cords appears longer than the other.

Worl was not observed constantly. At 11:45 p.m., 12 minutes after she was placed in the visitation room, Hall checked on Worl through a viewing window and observed her crying as she sat on the visitation-room bench. Two minutes later, at 11:47 p.m., McGowen checked on Worl. From the viewing window, McGowen could see only the top of Worl's head. McGowen returned to the dispatch office to retrieve a key to the room. Once she entered it, she discovered Worl on the floor with her head facing down. McGowen "gently lifted [Worl's] head back" and discovered one of the telephone cords wrapped around her neck. She removed the cord.

No. 22-10360
c/w No. 22-10361

McGowen then yelled for Hall to contact emergency medical services (EMS). Hall paged EMS at 11:48 p.m. and the Callahan County Sheriff at 11:52 p.m. Officers Hastings and Piper performed CPR on Worl until EMS arrived at 12:00 a.m. EMS obtained a pulse and transported Worl to the hospital, where she was placed on life support. She died the next day (4 April 2019).

B.

This action was filed in March 2021. Defendants' two summary-judgment motions (one for the two jailers, the other for the two Officers), based on qualified immunity, were granted in March 2022. In doing so, the district court sustained objections to plaintiffs' summary-judgment evidence.

In granting summary judgment, the district court concluded: "there [was] no evidence before the Court, beyond speculative evidence, to raise a genuine issue of material fact as to whether [defendants] appreciated that Worl was a suicide risk or that the phone cord would likely be an instrument of suicide"; and that Worl was "intoxicated, belligerent, uncooperative, and refused to answer questions related to mental health and suicide risk" was insufficient to make defendants subjectively aware of a substantial risk of self-harm.

The court ruled defendants' objections regarding, *inter alia*, authentication and hearsay, were meritorious. In the alternative, even if it considered the exhibits, they did not "raise a genuine issue of material fact as to deliberate indifference" by defendants.

A summary-judgment order and a Rule 54(b) judgment were entered in March 2022 for each of the two motions in favor of the two jailers and two officers in their individual capacities. *See* Fed. R. Civ. P. 54(b). (The court's summary-judgment orders did not address plaintiffs' bystander claims, but the claims were dismissed in the court's 54(b) judgments,

6

providing that "Plaintiffs' claims asserted against [defendants] in their individual capacit[ies] are" dismissed.)

## II.

Primarily at issue in this appeal are the failure-to-protect claims against jailer-dispatchers Hall and McGowen and Officers Hastings and Piper (defendants). Following addressing that issue, we turn to their sustained objections to plaintiffs' summary-judgment evidence.

## A.

Pursuant to the two-part test, discussed *infra*, plaintiffs generally claim genuine disputes of material fact exist for whether the jailers and Officers: subjectively knew Worl was at substantial risk of serious self-harm; and failed to appreciate the risk by knowingly placing unsupervised Worl in the visitation room containing a telephone cord, a commonly known obvious ligature. Because they fail to show genuine disputes of material fact regarding defendants' subjective knowledge of Worl's substantial risk of suicide, defendants are entitled to qualified immunity on the failure-to-protect claim.

It follows that, because the failure-to-protect claims fail, no violation exists for bystander claims against the jailers and Officers. *See Joseph ex rel. Est of Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020) (noting bystander liability requires, *inter alia*, that officer "knew a fellow officer was violating an individual's constitutional right"). Therefore, we address only the failure-to-protect claims.

A summary judgment is reviewed *de novo*. *E.g.*, *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 461 (5th Cir. 2015). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Ordinarily, our court "must view the evidence in the light most favorable to the party resisting the motion". *Trevino v. Celanese Corp.*, 701 F.2d 397, 407 (5th Cir. 1983). When, however, defendants, as in this instance, assert qualified immunity, the burden of proof shifts to plaintiffs to "rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law". *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

"Qualified immunity protects officers from suit unless their conduct violates a clearly established [statutory or] constitutional right." *Converse v. City of Kemah*, 961 F.3d 771, 774 (5th Cir. 2020) (quoting *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)). Plaintiffs maintain, solely for the purpose of preserving the issue for further review, that qualified immunity should be "abolished or modified so that it is inapplicable here". For this appeal, we proceed with the qualified-immunity doctrine intact.

Again, when defendants assert qualified immunity, "a plaintiff seeking to overcome qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct". *Id.* (citation omitted). We have discretion to elect which prong of this two-prong analysis to address first. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As stated, "[t]o overcome the officials' qualified immunity defense Plaintiffs must first demonstrate that each official violated [Worl's] statutory or constitutional right". *Converse*, 961 F.3d at 775. "[T]he Fourteenth Amendment protects[, *inter alia*,]pretrial detainees' right to medical care and to 'protection from *known* suicidal tendencies'". *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (emphasis added) (quoting *Garza v. City of Donna*,

922 F.3d 626, 632 (5th Cir. 2019)); *see also Converse*, 961 F.3d at 775 ("We have repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a *known* risk of suicide." (emphasis added)).

Where the claimed violation of that right turns, as in this instance, on an official's alleged acts or omissions, the question is whether the official "had gained *actual knowledge* of the substantial risk of suicide and responded with deliberate indifference". *Converse*, 961 F.3d at 775 (emphasis added) (quoting *Hare v. City of Corinth*, 74 F.3d, 633 650 (5th Cir. 1996) (en banc)). It is undisputed that "[d]eliberate indifference is an extremely high standard to meet". *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

Accordingly, an "official will not be held liable if he merely 'should have known' of a risk". *Converse*, 961 F.3d at 775 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Rather, to satisfy this high standard, plaintiffs must show the official: was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; and "also [drew] the inference". *Id.* (quoting *Farmer*, 511 U.S. at 837). An official with such knowledge then "shows a deliberate indifference to that risk 'by failing to take reasonable measures to abate it'". *Id.* at 776 (quoting *Hare*, 74 F.3d at 648).

Plaintiffs, however, maintain this court should instead apply the objective-unreasonableness standard the Court adopted in *Kingsley v. Hendrickson* for *claims of excessive force* (*not failure to protect*) by officers against a pretrial detainee. 576 U.S. 389 (2015). But, we are bound by our rule of orderliness. *E.g.*, *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by statutory amendment, or the Supreme Court,

or our *en banc* court."). This rule renders this assertion meritless. *See Cope v. Cogdill*, 3 F.4th 198, 207 n.7 (5th Cir. 2021) (explaining *Kingsley* "did not abrogate [this court's] deliberate-indifference precedent"), *cert. denied*, 142 S. Ct. 2573 (2022); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) ("Because the Fifth Circuit has continued to rely on *Hare* and to apply a subjective standard post-*Kingsley*, this panel is bound by our rule of orderliness.").

Regarding qualified immunity's second prong, for a right to be "clearly established" it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right". *Est. of Bonilla v. Orange Cnty.*, 982 F.3d 298, 306 (5th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Critically, "[c]ourts must not 'define clearly established law at a high level of generality'"; rather, we must undertake the inquiry "in light of the specific context of the case". *Cope*, 3 F.4th at 204 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Pursuant to our above-discussed discretion to elect which of the two qualified-immunity prongs to consider first, we begin with the first. For the reasons that follow, there was no violation of a statutory or constitutional right. Therefore, we do not reach the second prong (whether clearly established).

Again, for the first prong, and to prevail against summary judgment for the claimed violation at hand, plaintiffs must establish a genuine dispute of material fact for whether Hall, McGowen, Officer Hastings, or Officer Piper "(1) had subjective knowledge of substantial risk of serious harm and (2) responded to that risk with deliberate indifference". *Id.* at 210 (citation omitted); *Callahan*, 623 F.3d at 253. In the context of detainee suicide, the requisite substantial risk of serious harm must be specific; plaintiffs must allege defendants "were aware of a substantial and significant risk that the

detainee might kill himself". *Cope*, 3 F.4th at 207 (alteration omitted) (citation omitted).

When, as here, multiple government actors are defendants and assert qualified immunity, we "evaluate each [actor's conduct] separately, to the extent possible". *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

Because plaintiffs, for the reasons discussed *infra*, fail to establish genuine disputes of material fact regarding defendants' subjective knowledge of a substantial risk of suicide, whether defendants responded with deliberate indifference does not come into play.

1.

For the jailers, plaintiffs generally maintain genuine disputes of material fact exist for their subjective knowledge of Worl's substantial risk for serious self-harm, including suicide. They contend the conduct of both Hall and McGowen raise genuine disputes of material fact showing they subjectively understood the risk.

Regarding such genuine disputes *vel non*, we consider whether anything concerning Worl led Hall or McGowen to form the requisite subjective knowledge of a substantial risk, specifically a risk of suicide. *E.g.*, *Farmer*, 511 U.S. at 842; *Cope*, 3 F.4th at 207–08 (official witnessed decedent attempt suicide day before incident in question); *Converse*, 961 F.3d at 776, 778–79 (official was present when decedent was pulled off bridge while he attempted to jump and where official heard decedent express he should have jumped and would make another attempt to do so when released); *Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) (even though decedent stated he did not want to commit suicide, official knew decedent suffered from depression, had recently attempted suicide, and his wife believed him to be suicidal).

Both Hall and McGowen noted Worl's intoxication and lack of cooperation. That they recognized that Worl may have been intoxicated and observed her defiant demeanor is insufficient, however, to create a genuine dispute of material fact on whether they formed the requisite subjective knowledge of a substantial risk of suicide. *E.g.*, *Est. of Bonilla*, 982 F.3d at 305 (explaining even if detainee was intoxicated, it "would not indicate [official] inferred she was a suicide risk").

Regarding the lack of mental-health screening, plaintiffs emphasize that the jailers' failure to  conduct the screening shows a genuine dispute of material fact that Worl needed to be treated as suicidal. This assertion also fails. Our court has acknowledged there is no independent constitutional right to mental-health screening. *E.g.*, *id.* at 307 (quoting *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)) ("No decision of this Court establishes a right to proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols."). (Additionally, even if plaintiffs could assert a right to suicide screening, "evidence of inadequate screening . . . would not raise an issue of deliberate indifference without additional evidence that [the jailers] knew that [Worl] was in fact at risk for suicide". *Id.* at 305.) Even if Worl's refusal to cooperate should have alerted Hall and McGowen to a substantial risk of suicide, the summary-judgment record does not show a genuine dispute of material fact for whether they actually perceived that risk. *Converse*, 961 F.3d at 775–76.

Absent additional, independent evidence that the jailers believed Worl was at risk for suicide, failure to screen does not establish a genuine dispute of material fact for the jailers' subjective knowledge regarding Worl's risk of suicide. *E.g.*, *Est. of Bonilla*, 982 F.3d at 305. We turn to the conduct by each of the two jailers.

12

No. 22-10360
c/w No. 22-10361

a.

Hall, as dispatcher on duty, received the 911 call shortly after 10:00 p.m. regarding a domestic disturbance between the caller, Worl, and her husband. She dispatched the two Officers to the Worls' home.

In preparation for Worl's booking, Hall, according to her deposition, began entering Worl's information into the intake system and obtained background information on her. This background information included a check through the Texas Health and Human Services Commission's Continuity of Care Query (CCQ) system "to determine if Worl had previously received state mental healthcare or had a known intellectual or developmental disability". The CCQ check came back as "no match".

Once Worl arrived at the jail, Hall, in her deposition, described her as "uncooperative and vocal" and "[a]lmost in a combative state". She further explained in her deposition that, although the Officers told her Worl had been drinking, she did not observe anything leading her to independently believe Worl was intoxicated.

Hall, in the presence of the Officers, unsuccessfully attempted to book Worl. Later, McGowen joined them in attempting to complete the booking process. Hall observed McGowen: advise Worl that, if she would not cooperate, she would be placed in the visitation room; and then confiscate items from Worl. Hall was not present when Worl was placed in the room.

Hall, according to her affidavit, "never heard Worl make any statements to indicate she intended to harm herself, nor was [she] aware of any such statements to anyone else"; and, based on her observations, she "did not believe Worl was engaging in suicidal behavior or had mental health issues". Plaintiffs fail to establish a genuine dispute of material fact that Worl did or said anything to show Hall that she was suicidal or intended to harm

13

herself or that Hall otherwise drew that inference. *E.g.*, *Converse*, 961 F.3d at 776, 778–79; *Hyatt*, 843 F.3d at 178.

Because plaintiffs fail to establish a genuine dispute of material fact regarding Hall's subjective knowledge of a substantial risk of suicide, they fail to show a violation by Hall of Worl's statutory or constitutional right. Therefore, Hall is entitled to qualified immunity.

b.

McGowen, as Hall described in her deposition, was the jail's "acting supervisor" on duty on 2 April. During her shift, the Officers, via radio, notified her that: they had arrived at the jail; and a female, later identified as Worl, was being brought in. After the Officers arrived, but prior to Worl's being taken to booking, "Worl advised [Officer Hastings] she slipped her hand out of her handcuff". McGowen then spoke with Officer Hastings regarding McGowen's removing Worl's handcuffs as they could be used as a weapon. Officer Hastings then escorted Worl to booking; McGowen returned to the dispatch office.

A few minutes later, as stated in her affidavit and confirmed in her deposition, she "heard Worl raising her voice"; went to the booking area to determine whether Hall needed assistance; and Hall "advised [her] that Worl was not complying and was refusing to be booked in or to answer any questions", including the questions regarding the mental-health screening form.

When Worl continued to be noncooperative, McGowen conducted a pat-down of Worl, confiscating her coat, shoes, and an eyeglass lens she had felt in Worl's coat pocket. She instructed Worl that she would be placed in a holding cell (visitation room) until she could calm down and comply with the booking process. Prior to placing Worl in the visitation room, and in the presence of Officer Hastings, McGowen asked Worl if she had ever

attempted suicide. In response, as stated in McGowen's deposition, Worl "shook her arms at [her] and said, 'I don't know. Have I?'"

McGowen, in her affidavit, stated she "did not observe any injuries, scars or markings on Worl's wrists or arms and took [Worl's response] as an attempt by Worl to show [her] she had not attempted suicide". McGowen then, with Officer Hastings, placed Worl in the visitation room at 11:33 p.m., and returned to the dispatch office.

McGowen, in her affidavit, stated that, during the time Worl was in the jail, she "never heard [Worl] make any statements to indicate she intended to harm herself, nor was [she] aware of Worl making any such statements to anyone else". Pursuant to her prior training intended to assist her in recognizing inmates who are potentially suicidal or who may need mental-health assistance, and based on her observations of Worl, McGowen, as stated in her affidavit, "did not believe Worl was engaging in any suicidal behavior or had mental health issues".

Regarding McGowen's questioning Worl about whether she had previously attempted suicide, her response was vague and insufficient to establish a genuine dispute of material fact for whether McGowen was subjectively aware of a risk of suicide. *E.g.*, *Converse*, 961 F.3d at 775. McGowen's actions, including her conducting a pat-down, do not create a genuine dispute of material fact that those actions amounted to anything more than general jail protocol.

Because plaintiffs fail to establish a genuine dispute of material fact regarding McGowen's subjective knowledge of a substantial risk of suicide, they fail to show a violation by McGowen of Worl's statutory or constitutional right. Therefore, McGowen is entitled to qualified immunity.

No. 22-10360
c/w No. 22-10361

2.

For the two Officers, plaintiffs generally maintain that genuine disputes of material fact exist regarding the Officers' subjective knowledge of Worl's substantial risk for serious self-harm, including suicide. They contend the conduct of Officers Hastings and Piper create genuine disputes of material fact for whether they subjectively understood that risk.

As discussed *supra*, and regarding such genuine disputes *vel non*, we consider whether anything concerning Worl led the Officers to form the requisite subjective knowledge of a substantial risk, specifically a risk of suicide. *E.g.*, *Farmer*, 511 U.S. at 842; *Cope*, 3 F.4th at 207–08; *Converse*, 961 F.3d at 776, 778–79; *Hyatt*, 843 F.3d at 178.

Officers Hastings and Piper were dispatched to the Worls' home in response to the 911 call. The Officers spoke with both Worls to determine the situation. When, as seen in his body-cam video, Officer Piper asked Billy Worl whether Worl had any history of mental health, he responded no. However, when questioned whether she had any "mental health disabilities, like bipolar", he responded "yes, but in the past".

Plaintiffs claim that, instead of taking Worl to the jail, the Officers were required by Texas Health and Safety Code § 573.011(a)(1) to transport her to a mental-health-treatment facility. In doing so, plaintiffs contend the Officers acted with deliberate indifference; however, they fail to show genuine disputes of material fact regarding the Officers' subjective knowledge requiring such response. They assert Officer Hastings was aware of the procedure and could have utilized it.

The summary-judgment record does not show a genuine dispute of material fact that either Officer perceived a substantial risk of suicide. And, to the extent plaintiffs contend the Officers were required to take Worl into custody under Chapter 573, that procedure is permissive, not mandatory. *See*

TEX. HEALTH & SAFETY CODE § 573.001(a) ("A peace officer, without a warrant, *may* take a person into custody . . . ." (emphasis added)).

Regarding the lack of mental-health screening at the jail, plaintiffs maintain: the Officers knew the screening form had not been completed; and such knowledge creates a genuine dispute of material fact for whether Worl should have been treated as suicidal. As discussed *supra*, this assertion fails. Although our court has acknowledged there is no constitutional right to screening, even if Worl's refusal to cooperate should have alerted the Officers to a substantial risk of suicide, the summary-judgment record does not create a genuine dispute of material fact they perceived that risk. *E.g.*, *Est. of Bonilla*, 982 F.3d at 307 (quoting *Taylor*, 575 U.S. at 826); *Converse*, 961 F.3d at 775–76.

Absent evidence that the Officers formed the opinion that Worl was at a risk for suicide, knowledge that she was not screened does not establish a genuine dispute of material fact for the Officers' subjective knowledge regarding Worl's risk of suicide. *E.g.*, *Est. of Bonilla*, 982 F.3d at 305. We turn to the conduct by each of the two Officers.

a.

Officer Hastings, the arresting officer that night, explained in his deposition that he formed the opinion Worl was intoxicated because he was told she and her husband had consumed two boxes of wine. After arresting Worl, Officer Hastings transported her in his patrol vehicle.

Upon arriving at the jail, as shown in Officer Hastings' body-cam video, Worl told him she was "happy to be [t]here", and she thanked him for getting her out of the situation at her home. He escorted her to the booking area, where she was, as he described in his deposition, "irritated" when asked questions; he was unsuccessful in attempting to calm her down.

When they failed to complete the booking process, McGowen placed Worl in the visitation room while Officer Hastings observed. The Officer stated in his deposition that he did not recall McGowen's confiscating items from Worl, but conceded it is standard practice to do so because detainees can harm themselves with certain items. He further recounted Worl's presenting her arms to him and McGowen in response to being asked whether she had previously attempted suicide, but noted that he did not see any scars and that it wasn't clear why she was presenting her arms.

Officer Hastings' forming the opinion that Worl was intoxicated and uncooperative does not create a genuine dispute of material fact for whether he formed the required subjective knowledge of a substantial risk of suicide. *E.g.*, *id.* at 305. Evidence does not show Worl did, or said, anything explicitly or implicitly to establish a genuine dispute of material fact that Officer Hastings drew the inference she was a substantial risk of suicide.

Because plaintiffs fail to establish a genuine dispute of material fact regarding Officer Hastings' subjective knowledge of a substantial risk of suicide, they fail to show a violation by Officer Hastings of Worl's statutory or constitutional right. Therefore, Officer Hastings is entitled to qualified immunity.

b.

Officer Piper, the assisting officer on the scene that night, described in his deposition Worl's state at her home as "belligerent" and "[n]ot responding to [the Officers], yelling, and screaming, not wanting to give [the Officers] what she needed to tell [them], arguing with other officers". (As noted, two unidentified officers were also there.) In his deposition, he further explained that, although Worl was argumentative, he did not believe she was combative in a physical sense. He believed she was intoxicated and stated he could smell alcohol. He also stated in his deposition that Worl said, "she was

too drunk"; and he agreed that an intoxicated individual may not act rationally.

Although not referenced by either party, our review of the summary-judgment record, specifically the body-cam videos, revealed that, upon the Officers' *arriving* at the Worls' home, Worl stated in Officer Piper's presence: "I don't care if I die tonight" and "I'm tired of this". Worl was turned away from Officer Piper when she made these statements.

Despite her statement's being muffled, it is well established that video recordings are given a presumption of reliability and significant evidentiary weight because "[a]n electronic recording will many times produce a more reliable rendition . . . than will the unaided memory of a police agent". *United States v. White*, 401 U.S. 745, 753 (1971). Accordingly, where testimony conflicts with video evidence, our court must view the "facts in the light depicted by the videotape". *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also United States v. Vickers*, 442 F. App'x 79, 86, 87 & n.7 (5th Cir. 2011).

Even assuming Officer Piper heard these statements, it does not alter our analysis. The statements fail to create a genuine dispute of material fact that Officer Piper had *actual knowledge* of a risk of suicide or was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he "also [drew] the inference". *E.g.*, *Converse*, 961 F.3d at 775. Worl made these statements when the Officers first arrived at the Worls' home, at a time when Worl was not aware that she was going to be taken to jail. Considered in context, Worl's statements and tone appear to be directed at her frustration with her very distressing living situation. Moreover, that plaintiffs do not mention this interaction suggests they do not believe it is evidence regarding suicide propensity.

At the jail, Officer Piper assisted in attempting to book Worl; and he remembered talking to her to explain that, if she was noncompliant, they

would have to wait for her to become sober before she could be processed. He did not assist in placing Worl in the visitation room.

Although Officer Piper conceded in his deposition that he formed the opinion Worl was intoxicated, and he agreed that an intoxicated individual may not act rationally, this is insufficient to create a genuine dispute of material fact that the Officer formed the requisite subjective knowledge of a substantial risk of suicide. Likewise, his observing her noncompliance does not create genuine disputes of material fact. *E.g.*, *Est. of Bonilla*, 982 F.3d at 305. The summary-judgment record does not show Worl did, or said, anything explicitly or implicitly to create a genuine dispute of material fact that Officer Piper drew the inference she was a substantial risk of suicide.

Because plaintiffs fail to establish a genuine dispute of material fact regarding Officer Piper's subjective knowledge of a risk of suicide, they fail to show a violation by Officer Piper of Worl's statutory or constitutional right. Therefore, Officer Piper is entitled to qualified immunity.

## B.

In their responses in opposition to the two summary-judgment motions, plaintiffs attached exhibits for the summary-judgment record. In reply, defendants objected, albeit briefly, to many of those exhibits. In each of its two summary-judgment orders, the court in a brief note sustained the objections, ruling they were meritorious.

Preserved challenges to evidentiary rulings are reviewed for abuse of discretion. *E.g.*, *Caparotta v. Entergy Corp.*, 168 F.3d 754, 755 (5th Cir. 1999). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Certain Underwriters at Lloyd's v. Axon Pressure Prods., Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (citation omitted). Evidentiary rulings are "subject to the harmless error doctrine"; therefore, even if the court abused its discretion,

"the ruling will be reversed only if it affected the substantial rights of the complaining party". *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020) (citation omitted); *see also* FED. R. EVID. 103(a); *Perez v. Tex. Dept. of Crim. Just., Inst. Div.*, 395 F.3d 206, 210 (5th Cir. 2004) ("An erroneous evidentiary ruling is reversible error only if the ruling affects a party's substantial rights.").

The exhibits at issue generally contain research, as plaintiffs describe, regarding "widespread knowledge of jail suicides by telephone cords in the corrections community and the public generally", including expert reports, scholarly and news articles, and media depictions addressing telephone cords as ligatures.

Even assuming the court abused its discretion, the contested exhibits concern only defendants' knowledge regarding the risk of telephone cords as ligatures; they do not bear on defendants' subjective knowledge regarding whether Worl was a substantial suicide risk. Accordingly, the court's sustaining defendants' objections did not affect plaintiffs' substantial rights. Therefore, this assumed error was harmless. *Perez*, 395 F.3d at 210.

III.

For the foregoing reasons, the two Rule 54(b) judgments are AFFIRMED.