# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 2, 2023

Lyle W. Cayce
Clerk

———————

No. 21-11100

———————

Robert Steven Reitz, *also known as* "Bobby" Reitz,

*Plaintiff—Appellant*,

*versus*

Jimmy Woods, *Officer*; John R. Wilson, III, *Detective*; Larry Tatum, *Detective*; Taylor County, Texas,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 1:16-CV-181

———————————————————

Before Stewart, Elrod, and Graves, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Using a blocked number, an anonymous individual twice called 9-1-1 in Abilene, Texas, relaying a serious threat of gun violence against officers and an alleged hostage while providing his location. Abilene Police responded, only to find the apartment occupied by Plaintiff-Appellant Robert "Bobby" Reitz and his dog, with no hostage or lethal firearm in sight. Reitz was detained, taken to the police station, and ultimately released when an investigation proved inconclusive.

No. 21-11100

Weeks later, Reitz was charged with making a false report, though the charges were eventually dropped.  Reitz subsequently sued three individuals involved in his arrest and prosecution as well as Taylor County, Texas.  Each defendant moved for summary judgment, with the individuals asserting qualified immunity.  The district court granted the Defendants' motions.  Reitz appeals.  We AFFIRM IN PART and REVERSE IN PART and REMAND for further proceedings.

I

A

On September 4, 2015, the emergency services dispatch in Abilene, Texas, received an anonymous call wherein an unidentified individual informed the dispatcher that "I just shot my girlfriend" and "I used a 9mm to shoot my girlfriend right in the f—ing eye."  The dispatcher then asked the caller for his location, to which he gave Reitz's address, including both the building and apartment numbers.  The call concluded shortly after. Moments later, the caller phoned back, demanding "to speak to a hostage negotiator" and telling the dispatcher that his "girlfriend is tied up in the bathroom right now."  Ignoring the dispatcher's request for his name and phone number, the caller reiterated his demand and informed the dispatcher that he was in possession of "a 12-guage, . . . an M-16, and a 9-millimeter." Only then did the caller reconfirm he was at the address previously given, saying he was at the front door "waiting for the police to start knocking so [he] could start shooting."

The Abilene Police Department dispatched multiple officers, including a Special Weapons and Tactics team, to address the volatile situation.  After the officers created a perimeter around the apartment complex, the SWAT team forcibly breached the apartment's door without a

warrant based on their belief that exigent circumstances existed.[1]  Once inside, APD officers found only Reitz, his dog, and a Sig Sauer pellet gun. Officer Austin Graves then handcuffed Reitz and escorted him to a patrol car. An unnamed officer then took Reitz to Officer Jimmy Woods's patrol car and gave Woods Reitz's cell phone.[2]

Officer Woods, a detective in APD's Crimes Against Persons Division, was the "primary officer" for the incident "tasked with compiling information and drafting a report regarding the false 911 call."  Woods was initially stationed at the perimeter and did not enter Reitz's apartment until after the breach, beginning his investigation by photographing the scene. Woods next questioned Reitz, who explained that "nothing" happened, having just arrived home from a weekly visit to his psychiatrist.  Woods then spoke with Reitz's neighbor, Trevor Watts, who said that Reitz—in Woods's words—"acts kind of weird all the time" and "has a girlfriend coming and going from his apartment."  Woods followed up with Reitz about his girlfriend, to which Reitz replied that they had ended their relationship nearly a year prior.  Finally, Woods asked Reitz for consent to search his cell phone's call log; Reitz consented.  The log did not reveal any emergency calls, but Woods, notwithstanding Reitz's assistance, was unable to locate a log of deleted calls.  Woods asked Reitz if he would be willing to go to APD for technicians to search his phone; Reitz agreed.

---

[1] The Parties do not dispute that there were exigent circumstances meriting the breach.  Reitz conceded this to Magistrate Judge Parker, and at oral argument before this court, Reitz's counsel referred to the initial calls and subsequent response as "that exigency."  Accordingly, the court deems this point conceded.

[2] It is unclear who escorted Reitz to Woods's car and who gave Reitz the cell phone. However, neither detail impacts the issues at hand.

No. 21-11100

Upon arriving at APD, Reitz again consented to having his phone searched. Technical investigation failed to produce information, as the APD's "system was not able to download the call history of the phone . . . due to either the age of the cell phone, or its software." Reitz was subsequently released and taken back to his apartment.

Five days after the incident, APD assigned Detective John Wilson, III, to follow up on the case, including determining whether Reitz placed the initial calls. About two weeks after the incident, Reitz returned to the APD police station to obtain a copy of Detective Woods's report, in part to receive compensation for the damage done to his apartment in the breach.[3] While there, Reitz attempted to speak to Woods, who "did not want to talk to [him]" and who then left for lunch. During this visit, Reitz also met Stacie Wirmel, an investigative reporter affiliated with KTAB (a local television station), who asked to interview him regarding the incident. About an hour after Reitz left the station, Woods called Reitz and, according to Reitz, "was very abrasive" and "did not want [him] telling a reporter what had happened[.]" As the district court noted, "[a]lthough a copy of the KTAB news story was not included in the summary judgment record, it appears undisputed that it aired on October 13, 2015, in both televised and online versions."

After trying but failing to speak with Reitz three times throughout September, Wilson managed to speak with Reitz over the phone on October 13, 2015—which Wilson recorded. Wilson played Reitz a portion of one of the 9-1-1 call recordings and Reitz denied he was the anonymous caller. During this call, Wilson also told Reitz that the "phone was analyzed" and

_____

[3] The date of this incident is not clearly established in the record. Reitz estimates it was "[a]bout two (2) weeks after" the incident, an approximation the district court adopted in its memorandum.

deleted call logs showed Reitz as placing the calls in question, which Reitz contested given the tests run the day of the incident. Without addressing Reitz's objection, Wilson said he believed that the recordings sounded like Reitz, informed Reitz that he would be "filing this case" with local prosecutors as a "Terroristic Threat on Public Servants," suggested that Reitz call the APD or the district attorney with any questions, and offered to speak to counsel if Reitz had retained legal representation.

Indeed, according to Wilson's affidavit, upon listening to the recorded 9-1-1 calls and a recording of his call with Reitz, he "believe[d] that [] Reitz did make the 911 calls on September 4, 2015." Wilson also asked the 9-1-1 dispatcher who received the anonymous calls as well as another detective to compare the three recorded calls, and both "believed . . . that the same individual made all three calls." Following these corroborations, Wilson followed through on his pronouncement to Reitz and filed the case to the Taylor County District Attorney's Office as a Terroristic Threat. An Assistant District Attorney with the Office asked Wilson to re-file the case as a false report; Wilson complied. Larry Tatum, an Investigator with the Taylor County District Attorney's Office, signed the arrest affidavit, and Wilson executed the warrant at Reitz's place of work.

On November 25, 2015, following Reitz's arrest, Wilson decided, in consultation with an unnamed Assistant District Attorney working on the case, to send the recordings of all three calls to Dr. Robert Wallace, a professor in McMurry University's Sociology Department. Though Wilson and his supervisor, Sergeant Will Ford, were aware that Dr. Wallace "[was] not a voice recognition expert," they believed it was important to "have a second party look at the evidence." Per Wilson's notes: "Dr. Wallace concluded that in his opinion there is reasonable doubt that the recordings are the same person. This is a different opinion, and before this new evidence the officers and the same 911 [dispatcher] clearly stated this was the same

No. 21-11100

person." Wilson phoned the unnamed ADA to discuss Dr. Wallace's conclusion, and the ADA recommended dropping the case. Wilson did so, recognizing that given Dr. Wallace's conclusion, there was "some reasonable doubt that" Reitz dialed 9-1-1.

B

Reitz filed his Original Complaint on October 11, 2016. All defendants would eventually move for summary judgment. In support of his opposition to each motion, Reitz submitted an affidavit from Robert Gill, a former felony prosecutor in the Tarrant County District Attorney's Office and a former Tarrant County judge.

First, the district court excluded Gill's affidavits, finding them to be "invad[ing] the province of the Court," "encroach[ing] on issues which are reserved to the Court," "and thus [] mainly irrelevant." In the same order, the district court then granted all of the Defendants' motions for summary judgment.[4] Regarding the Fourth Amendment claims, the district court found that: (1) Woods had probable cause to arrest Reitz; (2) Wilson did not include false statements in his notes, nor could Reitz establish any statements—even if assumed untrue *arguendo*—were included intentionally or recklessly; and (3) Tatum reasonably relied on the information provided to him by other officers and the assistant district attorney prosecuting the case. The district court dismissed Reitz's First Amendment claims against Woods and Wilson because it found no adverse action befell Reitz as a result of his discussions with the news media and because the officers charged him in light of a determination of probable cause he committed the crime rather than due to any personal retaliatory animus.

_____

[4] The parties consented to trial before a magistrate judge.

No. 21-11100

Reitz now appeals.[5]

## II

"This court reviews a grant of a motion for summary judgment *de novo*, and applies the same standard as the district court, viewing the evidence in the light most favorable to the nonmovant." *Clark v. Dep't of Pub. Safety*, 63 F.4th 466, 469 (5th Cir. 2023) (citation omitted) (italics added). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"Preserved challenges to evidentiary rulings are reviewed for abuse of discretion." *Crandel v. Hall*, 75 F.4th 537, 550 (5th Cir. 2023). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Certain Underwriters at Lloyd's of London v. Axon Pressure Prods., Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (citation omitted). Furthermore, "[e]videntiary rulings are 'subject to the harmless error doctrine'; therefore, even if the court abused its discretion, 'the ruling will be reversed only if it affected the substantial rights of the complaining party.'" *Crandel*, 75 F.4th at 550 (quoting *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020)); *see also Perez v. Tex. Dept. of Crim. Just., Inst. Div.*, 395 F.3d 206, 210 (5th Cir.

---

[5] For clarity, we reverse the order of challenges raised—considering the admissibility of Gill's affidavits before the substantive claims—recognizing that the adjudication of the former could influence the adjudication of the latter.

2004) ("An erroneous evidentiary ruling is reversible error only if the ruling affects a party's substantial rights.").

## III

Reitz appeals the district court's exclusion of Gill's affidavits that he submitted in opposition to Defendants' motions for summary judgment.

"The admissibility of expert testimony is governed by the same rules, whether at trial or on summary judgment." *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136–37 (5th Cir. 1996). Accordingly, "[m]aterial that is inadmissible will not be considered on a motion for summary judgment[.]" *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990)).

"The Supreme Court's landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* provides the analytical framework for determining whether expert testimony is admissible under Rule 702 of the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002) (footnotes omitted). "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* at 243–44 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)). But such an opinion is confined to questions of fact, as "an expert may *never* render conclusions of law." *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009) (quoting *Snap–Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 198 (5th Cir. 1996)) (emphasis added); *see also Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (same). With these guardrails established, we turn to the evidence at bar.

The Gill affidavits proffered a primer on relevant precedent, from the Fourth Amendment's protections and probable cause determinations to First Amendment retaliation claims and criminal trial practice. Regarding their conclusions, the district court aptly summarized:

> Gill's opinions can be distilled down to his conclusions that (1) there was no probable cause for Reitz's arrests and charging (Woods and Wilson), (2) the information relied upon by Tatum in executing the probable cause affidavit was insufficient and thus he lacked sufficient knowledge of probable cause (Tatum and the County), (3) Woods and Wilson violated Reitz's First Amendment rights (Woods and Wilson), (4) the County had a policy, practice, or custom of permitting probable cause affidavits to be executed by affiants who lacked sufficient knowledge of probable cause, and (5) the County ratified Tatum's actions for purposes of establishing *Monell* liability (the County).

The district court found that the affidavits were replete with "numerous flaws in both methodology and substance," and while "stop[ping] short of finding that Gill's opinions are unreliable," the court excluded the evidence as an attempt to "supply both the law and the ultimate legal conclusions Reitz seeks." In so doing, the district court did not abuse its discretion.

Consider the first and second conclusions proffered, which concern the existence of probable cause. "The question of probable cause is a mixed question of law and of fact. Whether the circumstances alleged to show it probable are true, and existed, is a matter of fact; but whether, supposing them to be true, they amount to a probable cause, is a question of law." *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878); *see also Davis v. Hodgkiss*, 11 F.4th 329, 334 (5th Cir. 2021) (holding that the "ultimate determination of probable cause . . . is a question of law" (quoting *United States v. Ho*, 94 F.3d 932, 936 (5th Cir. 1996))), *cert. denied*, 142 S. Ct. 1127 (2022); *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) ("Whether the facts establish

probable cause is a legal question." (citing *United States v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009))); *United States v. Muniz-Melchor*, 894 F.2d 1430, 1439 n.9 (5th Cir. 1990) (explaining that whether an officer has probable cause is a mixed question of law and fact, but the ultimate determination is a question of law).

The same is true regarding Gill's conclusion on Reitz's First Amendment retaliation claims; Gill brings no additional facts or analysis to bear with respect to these claims, merely parroting Reitz's testimony, "dress[ing] [it] up and sanctify[ing] [it] as the opinion of an expert." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Accordingly, Gill's "opinions" in these arenas "invade[] the court's province and [are] irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

The final two areas of Gill's affidavits suffer related infirmities. Once again, Gill fails to provide any additional evidence or discussion in his role as an expert beyond rendering bare legal conclusions regarding Taylor County's policies and actions, rendering discussion thereof inadmissible. *See Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (holding that expert opinions "setting forth ultimate or conclusory facts and conclusions of law" are inadmissible and noting that that is "especially applicable where, as here, the expert is opining on . . . issue[s] more properly left to judges and juries" (internal quotation marks and citation omitted)). We cannot say the trial court abused its discretion in excluding these affidavits.

IV

Reitz asserts, under 42 U.S.C. § 1983, constitutional claims sounding in violations of his First and Fourth Amendment rights against three individuals (Woods, Wilson, and Tatum) as well as Taylor County. Because the three individuals assert a qualified immunity defense that the

No. 21-11100

municipality cannot, we review this defense first in the context of both First and Fourth Amendment claims.  Thereafter, we turn to the municipality's liability.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation and quotation marks omitted).  In other words, the doctrine shields public servants acting within their discretion from civil liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  "Qualified immunity includes two inquiries.  The first question is whether the officer violated a constitutional right.  The second question is whether the 'right at issue was "clearly established" at the time of the alleged misconduct.'" *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232 (alteration accepted)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("Qualified immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." (internal citation and quotation marks omitted)).

We begin with Reitz's alleged First Amendment retaliation claims and then turn to his Fourth Amendment claims.

A

To establish a First Amendment retaliation claim, a plaintiff must show that: "(1) [he was] engaged in a constitutionally protected activity, (2) the defendant['s] actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and

11

(3) the defendant['s] adverse actions were substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). As to the second element, "a retaliation claim requires some showing that the plaintiff['s] exercise of free speech has been curtailed." *Id.* at 259. It is in this arena that Reitz's claim falls short: he cannot establish that he "suffer[ed] an injury that would chill a person of ordinary firmness from continuing to engage in" his speech or that his speech was curtailed. *Id.* at 258, 259.

As the district court stated, Reitz "alleges only that the actions of Woods made him 'scared.'" In the district court's view, this was insufficient to constitute injury under First Amendment retaliation jurisprudence because, "from the excerpts from the news story that appear in the summary judgment record, Reitz apparently felt free not only to speak to the reporter, but to speak frankly and express views critical of the police."

Regarding his alleged injury, Reitz described his phone call with Woods as "very scary." Elsewhere, Reitz referred to Woods's calls as "threatening" and Wilson's outreach as "scary." We are not indifferent to the difficulties and fears Reitz alleges, but neither are we indifferent to this court's precedent.

In *Colson v. Grohman*, this court held that a First Amendment retaliation injury was not sufficient for such a claim where a plaintiff "alleged only that she was the victim of criticism, an investigation (or an attempt to start one), and false accusations," referring to these as "harms that . . . are not actionable under our First Amendment retaliation jurisprudence." 174 F.3d 498, 512 (5th Cir. 1999). Following *Colson*, we have held that being subjected to and defending oneself from an investigation while suffering its concomitant stress does not satisfy the injury requirement. *See Slegelmilch v. Pearl River Cnty. Hosp. & Nursing Home*, 655 F. App'x 235, 239–40 (5th Cir.

2016) (unpublished); *Matherne v. Larpenter*, No. 99-30746, 2000 WL 729066, at *3 (5th Cir. May 8, 2000) (unpublished) (holding "that retaliatory criticisms, investigations, and false accusations that do not lead to some more tangible adverse action are not actionable under § 1983" (quoting *Colson*, 174 F.3d at 513)). In line with these decisions, Reitz's injuries, such as they are, do not rise to the level of a constitutional violation. *See, e.g.*, *Colson*, 174 F.3d at 514 (dismissing First Amendment retaliation claim under § 1983 where an insufficient injury was alleged). Accordingly, we need not review the remaining elements of Reitz's First Amendment retaliation claims as applied to each defendant.

## B

Nearly four decades ago, the Supreme Court made clear that:

when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes . . . such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 816 (1985). We turn then to whether Reitz was detained or arrested absent probable cause and, if so, whether the probable cause analysis was unreasonable, which would overcome the qualified immunity defense.

"The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (internal citation omitted). In other words, probable

cause means a "'fair probability' that the defendant committed [the crime], which requires more than a 'bare suspicion' but less than a preponderance of evidence." *United States v. Watson*, 273 F.3d 599, 602–03 (5th Cir. 2001) (internal citation omitted). Finally, the adjudication of probable cause is an objective test: "[C]ourts must look to the 'totality of the circumstances' and decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer' demonstrate 'a probability or substantial chance of criminal activity.'" *Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) (internal citation omitted).

As Reitz argues in his brief, his Fourth Amendment rights were violated "at different stages of the case in different ways" by the three individual defendants: Woods in detaining Reitz following a search of his apartment, Wilson in preparing a report to support an arrest warrant, and Tatum in signing an incomplete and incorrect affidavit without reviewing the underlying investigative materials. We review these claims separately.

Reitz's Fourth Amendment claim against Woods sounds in his allegedly unlawful, prolonged detention following the anonymous calls and apartment breach. Neither party contests the permissibility of Reitz's initial detention under the exigent circumstances: the officers credibly believed that both their lives and the life of a wounded hostage were in danger. But officers "may not disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988). Here, the officers at the scene could not disregard that the key details of both calls were proven untrue: no one shot at any officers as they breached the door, none of the three firearms named in the call were located, no injured hostage was found in the apartment, and no evidence of injury was present. Accordingly, probable cause for detention pursuant to any concern about a violent or terroristic threat had been vitiated.

Woods seemingly agrees, asserting that the nature of the probable cause changed from the time of Reitz's initial arrest to the duration of his continued detention. Whereas Reitz's initial arrest was based on probable cause related to the reported hostage situation, his continued detention was based on probable cause related to making a false police report.

This tracks the district court's reasoning, which found that probable cause existed to continue restraining Reitz after the exigent circumstances had dissipated in light of five facts: (1) Reitz's living at the address given by the anonymous caller; (2) Reitz's ownership of a pellet gun; (3) Reitz's regular visits with a mental health professional, including that day; (4) Reitz's neighbor's statements that he acts "weird"; and (5) Reitz's conflicting account of his love life vis-à-vis a neighbor. On appeal, Woods urges us to adopt the district court's reasoning in reliance upon the same facts. We decline to do so.

Reitz's ownership of a legal and non-lethal firearm, for example, has no bearing on the notion that he would falsely call 9-1-1. Further, visits with a mental health professional are only relevant to probable cause determinations if said visits *specifically* connect the patient to a crime or a particular concern, typically in the form of the professional's express representations on the subject. *See Rich v. Palko*, 920 F.3d 288, 296 (5th Cir. 2019) ("Based on the representations of credible persons [including a treating psychiatrist] and their own observations, the officers reasonably concluded that Dupuis-Mays was mentally ill and posed a substantial risk of serious harm to himself or others"); *Sullivan v. Cnty. of Hunt*, 106 F. App'x 215, 218 (5th Cir. 2004) (unpublished) (holding that there existed probable cause to detain an individual for a mental health evaluation where psychiatrist

indicated that the person "could be suicidal").[6] The same holds true for the two other factors identified: that a neighbor would have a different account of Reitz's guests is apropos of nothing, while the neighbor's vague description of Reitz as "weird" does not appropriately factor into the probable cause analysis. *Cf. United States v. Sandoval*, 847 F.2d 179, 185 (5th Cir. 1988) ("[A]n officer's bare 'hunch' that a person has committed a crime does not constitute probable cause."). Accordingly, there was no probable cause to continue to detain Reitz after the facts supporting the initial detention had dissipated.

We must now ask whether Woods could have reasonably thought his actions were lawful, as "[p]olice officers who 'reasonably but mistakenly conclude that probable cause is present' are entitled to qualified immunity."[7] *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). This inquiry asks "whether '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right.'" *Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992) (quoting *Anderson*, 483 U.S. at 640).

---

[6] We agree, too, with Reitz's argument against reasoning otherwise: holding that mental health treatment contributes to a finding of probable cause of a crime "would establish a dangerous precedent perpetuating blanket stereotypes and mistaken assumptions about psychiatric treatment."

[7] "To be clear, the objective reasonableness of the defendant officers' conduct goes to the question of whether [Reitz's] constitutional right against [being arrested absent probable cause] was violated, not the question of whether that right was clearly established under these particular circumstances." *Baker v. Coburn*, 68 F.4th 240, 251 n.10 (5th Cir. 2023), *as revised* (May 19, 2023). This inquiry does not aim to "add[] a standalone 'objective reasonableness' element to the Supreme Court's two-pronged test for qualified immunity." *Id.*

No. 21-11100

We are not persuaded by Woods's argument. For the reasons outlined above, the factors Woods identified as giving rise to probable cause for an arrest on the charge of making a false police report are wholly unrelated to the charge. Furthermore, "this is not a situation in which we must be concerned with second-guessing an officer's decision that was required to be made in a split second." *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003). In *Evett*, having found as a matter of law that "that there was no probable cause for [the plaintiff's] arrest," we "look[ed] to the facts to determine whether a reasonably competent officer in [the arresting officer's] position could reasonably have thought his actions to be consistent with the rights he is alleged to have violated." *Id.* at 688. Those facts considered both the tenuousness of what purportedly gave rise to probable cause as well as the "unhurried setting" in which a reasonable officer could have investigated further absent any pressing or exigent circumstances but chose not to. *See id.* at 689.

The same concept presents itself here. Reitz's detention was prolonged as Woods undertook his preliminary investigation and any exigency or threat had long since dissipated. The only stone then still unturned was a review of any deleted call logs that Woods and Reitz were jointly unable to retrieve from Reitz's phone at the apartment. But an inability to retrieve those logs is far from sufficient to arrest Reitz, particularly where a reasonable officer who has already begun an initial investigation could have continued doing so by requesting that Reitz voluntarily submit his phone for review or seeking a warrant solely to search his phone—an investigative step later taken. Moreover, as Reitz noted in oral argument, it would be nonsensical for someone to file a false report on himself that could have easily resulted in damage to his own apartment, if not his death at the hands of the police. Given the totality of the circumstances, "[w]e cannot conclude that based on such minuscule information in an unhurried setting

such as in this case, that arresting [Reitz] was objectively reasonable." *Id.* Accordingly, Woods is not entitled to qualified immunity on this claim; it must proceed to trial.

Reitz's claim against Wilson is based on Reitz's belief that Wilson provided false statements to prepare the arrest warrant. The record evidence undermines Reitz's argument.

Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), even if an independent magistrate judge approves a warrant application, "a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes 'a false statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks*, 438 U.S. at 155–56).

> Although the *Franks* inquiry is often described as two prongs, the inquiry effectively consists of three questions, all of which must be met. First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?

*United States v. Ortega*, 854 F.3d 818, 826 (5th Cir. 2017) (citations omitted).

We have extended *Franks* liability to any "officer who has provided information for the purpose of its being included in a warrant application" and therefore "has assisted in preparing" it. *Melton v. Phillips*, 875 F.3d 256, 262 (5th Cir. 2017) (en banc). There is little doubt Wilson is such an officer. As the district court summarized, Wilson "reviewed the original incident reports, investigated the facts and circumstances surrounding the 911 calls, and prepared his own reports documenting his findings," ultimately

submitting the case to the District Attorney's Office. Indeed, Wilson concedes in his briefing that he submitted his report to the District Attorney's office "knowing that the arrest warrant would be drafted from the entirety of that information."

The district court found that "Reitz does not direct the Court to any statement by Wilson that was false or misleading." Rather, the district court correctly noted that the statements of which Reitz complains—Wilson's identifying Reitz as the 9-1-1 caller—are "phrased as his subjective impression, not an incontrovertible fact." We agree.

Wilson stated in his report that "[i]t *appears* that the recorded calls are from the same person." Furthermore, Wilson qualified this statement again, writing: "It should be noted that the suspect in this case stated that he did not make the calls[.]" These are not misstatements, but qualified statements that do not give rise to *Franks* liability. Because Reitz's Fourth Amendment claim against Wilson fails the first *Franks* prong, further discussion is unnecessary, and we affirm the district court's determination on this claim.[8]

Reitz's final individual Fourth Amendment claim concerns the affidavit Tatum signed and presented to the magistrate judge to secure Reitz's arrest warrant. Reitz homes in on the following misstatements and omissions in the affidavit: (1) providing an incorrect date for when the incident occurred, (2) failing to include that Reitz believed none of his neighbors had a problem with him, (3) omitting Reitz's statements about his former girlfriend, and (4) omitting details regarding the APD's search of Reitz's phone as yielding no evidence of a call to the emergency services line.

_____

[8] Wilson's affidavit for the search warrant issued after his arrest includes an untrue statement—"The call logs had been deleted." But because this is an altogether separate affidavit filed after the arrest warrant was issued, it is of no consequence here.

No. 21-11100

Reitz argues that because "Tatum had no personal knowledge" concerning the investigation and failed to make any effort to obtain such knowledge, the misstatements and omissions evince a reckless disregard for the truth.

Reitz is correct on the law: not only does *Franks* concern misstatements, discussed above, but also "the intentional or reckless *omission* of material facts from a warrant application[.]" *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (citing *Hale v. Fish*, 899 F.2d 390, 400 n.3 (5th Cir. 1990)) (emphasis added). Applying the *Franks* framework to both falsehoods and omissions, assuming misstatements are present or relevant omissions were made and assuming the requisite intentionality or recklessness be found, courts are to "consider the faulty affidavit as if those errors and omissions were removed," meaning we "must examine the 'corrected affidavit' and determine whether probable cause for the issuance of the warrant survives the deleted false statements and material omissions." *Winfrey*, 901 F.3d at 495 (quoting *Franks*, 438 U.S. at 156). Assuming *arguendo* the four statements listed above were false or omitted and done so either intentionally or recklessly, if the affidavit was amended to remedy the errant date and include those statements, a reasonable magistrate judge could still determine that there was probable cause to arrest Reitz on the charge of making a false alarm or report.[9]

---

[9] In his complaint, Reitz writes that the affidavit was "was false and so defective as to be in fact fraudulent." The Supreme Court's decision in *Malley v. Briggs* stands for the basic proposition that an affiant is liable where "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue" due to a lack of probable cause. 475 U.S. 335, 341 (1986). Notwithstanding his statement in his complaint, Reitz does not expressly argue on appeal that the warrant was facially invalid, which by definition impliedly concedes that the warrant as constituted gives rise to probable cause. Given this apparent concession, citations to *Malley* as well as its progeny *Messerschmidt v. Millender*, 565 U.S. 535 (2012) bear only on the second *Franks* question,

No. 21-11100

Insofar as "'probable cause' means something more than 'mere suspicion,'" it still does not reach the preponderance-of-the-evidence standard. *United States v. Gordon*, 580 F.2d 827, 832 (5th Cir. 1978) (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see United States v. Watson*, 273 F.3d 599, 602–03 (5th Cir. 2001) (noting that probable cause is "less than a preponderance of evidence"). A reasonable magistrate judge could find probable cause based on the opinion of the police officer who spoke directly to Reitz and believed him to be the anonymous 9-1-1 caller. "What is more, a complete affidavit would include other information" that could further buttress a finding of probable cause, including that Wilson corroborated his belief with another police officer as well as the 9-1-1 dispatcher that received the anonymous calls. *Loftin v. City of Prentiss*, 33 F.4th 774, 782 (5th Cir. 2022). Because a corrected "affidavit still would have shown probable cause," we affirm the district court's order granting summary judgment to Tatum. *Laviage v. Fite*, 47 F.4th 402, 407 (5th Cir. 2022).[10]

---

namely whether such statements and omissions were the result of a reckless disregard for the truth.

[10] Our recent decision in *Rogers v. Smith* does not dictate otherwise. In that case, the District Attorney "warned [the defendants] that the arrest would be unconstitutional," and "the warrant application for Plaintiff's arrest omitted key information when it failed to advise the judge regarding the DA's position that the arrest would be unconstitutional." *Rogers v. Smith*, 603 F. Supp. 3d 295, 302 (E.D. La. 2022), *aff'd*, No. 22-30352, 2023 WL 5144472 (5th Cir. Aug. 9, 2023). Though the trial court did not explicitly find a *Franks* violation, it noted that the arrest warrant application omitted vital information by failing to advise the judge of the DA's position that the arrest would be unconstitutional. *See id.* Thus, that omission likely constituted a *Franks* violation because, if disclosed, that would have vitiated probable cause, else it was cognizable as a *Malley* violation by putting forward a facially invalid affidavit. Furthermore, even though the district court did not make an express finding under either *Franks* or *Malley*, the district court concluded that "no reasonable officer could have believed that probable cause existed where the unconstitutionality of Louisiana's criminal defamation statute as applied to public officials has long been clearly established and where the officers had been specifically warned that

### C

Finally, Reitz brings a claim against Taylor County premised upon his allegations and claims against Tatum. Specifically, Reitz alleges that Tatum acted pursuant to the County's unconstitutional policy, practice, and procedure, and that the County ratified the unconstitutional misconduct. This claim cannot succeed.

A citizen may sue a municipality that violates his or her constitutional rights "under color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "To succeed, the plaintiff must identify a federal right that was violated 'pursuant to an official municipal policy.'" *Edwards v. City of Balch Springs*, 70 F.4th 302, 307 (5th Cir. 2023) (quoting *Liggins v. Duncanville*, 52 F.4th 953, 955 (5th Cir. 2022)). "This claim, also known as a *Monell* claim, requires '(1) an official policy (2) promulgated by the municipal policymaker (3) [that] was the moving force behind the violation of a constitutional right.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)).

Further discussion of *Monell*'s elements, contours, and jurisprudence is unnecessary. As the third element makes clear, "without a predicate

---

the arrest would be unconstitutional." *Rogers*, 603 F. Supp. 3d at 302. Given the facts and the district court's holding, our court's affirmance in that case does not give rise to separate procedural liability.

We also state that this conclusion in no way suggests that an otherwise uninformed officer should serve as an affiant solely to enable a police department to deploy the "collective knowledge doctrine . . . as a subterfuge to evade probable cause requirements." *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984). We have previously reminded "police departments to 'seek to provide magistrates with warrant applications from the law enforcement official most directly involved in the investigation and most directly involved with the facts stated in the affidavit.'" *Michalik v. Hermann*, 422 F.3d 252, 259 n.6 (5th Cir. 2005) (quoting *Bennett v. City of Grand Prairie*, 883 F.2d 400, 407 (5th Cir. 1989)).

constitutional violation, there can be no *Monell* liability." *Loftin*, 33 F.4th at 783 (citing *Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020)); *see also Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) ("[E]very *Monell* claim requires an underlying constitutional violation." (internal citation and quotation marks omitted)). Tatum is the only Taylor County employee involved in this suit, serving in the Taylor County District Attorney's Office. Reitz's suit against Taylor County is therefore wholly premised on Tatum's alleged wrongdoing. Affirming the district court's grant of summary judgment on Reitz's Fourth Amendment claim against Tatum as we have vitiates Reitz's *Monell* claim. *See Loftin*, 33 F.4th at 783 ("Because Loftin failed to demonstrate any constitutional violation . . . , the associated *Monell* claims must also fail.").

\* \* \*

We AFFIRM IN PART and REVERSE IN PART and REMAND for further proceedings. Specifically, we AFFIRM the district court's order regarding the exclusion of the Gill affidavits, the dismissal of Reitz's First Amendment claims against Wilson and Woods, and the dismissal of Reitz's Fourth Amendment claims against Wilson, Tatum, and Taylor County. We REVERSE the district court's order regarding Reitz's Fourth Amendment claim against Woods.